(No. 38914.— )

*In re* ESTATE OF BERNICE BROOKS, Alleged Incompetent,— MARGARET I. ASTE *et al.*, Appellees, *vs.* BERNICE BROOKS *et al.*, Appellants.

*Opinion filed March 18, 1965.*

KARL M. MILGROM, of Chicago, (W. GLEN HOW, Q.C., of Toronto, Canada, of counsel,) for appellants.

DANIEL P. WARD, State's Attorney, of Chicago, (EDWARD J. HLADIS, FRANCES G. SOWA, and JOSEPH V. RODDY, Assistant State's Attorney, of counsel,) for appellees.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

This is an appeal from the probate division of the circuit court of Cook County which entered an order appointing a conservator of the person of Mrs. Bernice Brooks, and allowed the conservator's request to be authorized to consent, on behalf of Mrs. Brooks, to transfusions of whole blood to her. The transfusions were made, and appellants, Mrs. Brooks and her husband, now seek to have all orders in the conservatorship proceedings expunged, and the petition therein filed dismissed. Questions under both Federal and State constitutions confer jurisdiction on direct appeal. U.S. Const., 1st, 5th and 14th amendments; Ill. Const., art. VI, sec. 5; Supreme Court Rule 28—1.

On and sometime before May 7, 1964, Bernice Brooks was in the McNeal General Hospital, Chicago, suffering from a peptic ulcer. She was being attended by Dr. Gilbert Demange, and had informed him repeatedly during a two-year period prior thereto that her religious and medical convictions precluded her from receiving blood transfusions. Mrs. Brooks, her husband and two adult children are all members of the religious sect commonly known as Jehovah's Witnesses. Among the religious beliefs adhered to by members of this group is the principle that blood transfusions are a violation of the law of God, and that transgressors will be punished by God. This organization's publication, "Blood, Medicine and the Law of God", which had been filed by Mrs. Brooks with her physician, states the principle: "The matter was not to be taken lightly. Any violation of the law on blood was a serious sin against God, and God himself would call the law violator to account. 'As for any man of the house of Israel or some alien resident who is residing as an alien in your midst who eats any sort of blood, I shall certainly set my face against the soul that is eating the blood, and I shall indeed cut him off from among his people'.—Leviticus 17:10". Also a part

of the foundation for this belief is the admonition found in the book of the Acts of the Apostles, 15:28-29: "For it seemed good to the Holy Ghost, and to us, to lay upon you no greater burden than these necessary things; that ye abstain from meats offered to idols, and from blood, and from things strangled, and from fornication; from which if ye keep yourselves, ye shall do well". Various other Biblical texts are quoted as authority for the belief, including Genesis 9:3-4: "Every moving animal that is alive may serve as food for you. As in the case of green vegetation, I do give it all to you. Only flesh with its soul—its blood— you must not eat". Premised upon the belief that "The blood is the soul" (Deuteronomy 12:33) and that "We cannot drain from our body part of that blood, which represents our life, and still love God with our whole soul, because we have taken away part of 'our soul—our blood—' and given it to someone else" (Blood, Medicine and the Law of God, p. 8), members of Jehovah's Witnesses regard themselves commanded by God to neither give nor receive transfusions of blood.

Mrs. Brooks and her husband had signed a document releasing Dr. Demange and the hospital from all civil liability that might result from the failure to administer blood transfusions to Mrs. Brooks. The patient was assured that there would thereafter be no further effort to persuade her to accept blood.

Notwithstanding these assurances, however, Dr. Demange, together with several assistant State's attorneys, and the attorney for the public guardian of Cook County, Illinois, appeared before the probate division of the circuit court with a petition by the public guardian requesting appointment of that officer as conservator of the person of Bernice Brooks and further requesting an order authorizing such conservator to consent to the administration of whole blood to the patient. No notice of this proceeding was given any member of the Brooks family. Thereafter, the con-

servator of the person was appointed, consented to the administration of a blood transfusion, it was accomplished and apparently successfully so, although appellants now argue that much distress resulted from transfusions due to a "circulatory overload".

We are met at the outset with appellees' contention that since the blood transfusions have been given, the conservator has been discharged, and the estate has been closed, this cause is now moot. As to this question, language in a previous decision of this court (*People ex rel. Wallace* v. *Labrenz*, 411 Ill. 618, 622-23) is particularly appropriate:

"Before we reach the merits, we meet the State's contention that the case is now moot and should be dismissed because the blood transfusion has been administered, the guardian discharged and the proceeding dismissed. Because the function of courts is to decide controverted issues in adversary proceedings, moot cases which do not present live issues are not ordinarily entertained. 'The general rule is that when a reviewing court has notice of facts which show that only moot questions or mere abstract propositions are involved or where the substantial questions involved in the trial court no longer exist, it will dismiss the appeal or writ of error'. *People* v. *Redlich*, 402 Ill. 270, 279.

"But when the issue presented is of substantial public interest, a well-recognized exception exists to the general rule that a case which has become moot will be dismissed upon appeal. (See cases collected in 132 A.L.R. 1185.) Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question.

"Applying these criteria, we find that the present case falls within that highly sensitive area in which governmental action comes into contact with the religious beliefs

of individual citizens. * * * In situations like this one, public authorities must act promptly if their action is to be effective, and although the precise limits of authorized conduct cannot be fixed in advance, no greater uncertainty should exist than the nature of the problems makes inevitable. In addition, the very urgency which presses for prompt action by public officials makes it probable that any similar case arising in the future will likewise become moot by ordinary standards before it can be determined by this court. For these reasons the case should not be dismissed as moot."

We accordingly proceed to a consideration of the issues.

It is argued by appellants that the absence of notice in any form to Mrs. Brooks or her husband, who were readily available at the hospital, constituted a denial of due process vitiating the entire proceedings; that insufficient proof was presented to establish the patient's incompetency (the doctor testified Mrs. Brooks was "semi-disoriented" and not "fully capable" but also stated "I think she would consent to surgery. It is the fact this is a transfusion of blood she objects to"); and that acceptance of medical treatment previously refused because of religious and medical reasons (blood transfusions are not entirely free from hazard) cannot be judicially compelled under the circumstances here present.

While, under the particular circumstances here, some merit is to be found in all of these contentions, we believe we should predicate our decision upon the fundamental issue posed by these facts, i.e.: When approaching death has so weakened the mental and physical faculties of a theretofore competent adult without minor children that she may properly be said to be incompetent, may she be judicially compelled to accept treatment of a nature which will probably preserve her life, but which is forbidden by her religious convictions, and which she has previously steadfastly refused to accept, knowing death would result from such re-

fusal? So far as we have been advised or are aware, there is no reported decision in which this question has been squarely presented and decided.

It is established that the commands of the First Amendment to the United States Constitution relating to religious freedom are embraced within the Fourteenth Amendment and by it extended to the States. (*Cantwell* v. *Connecticut,* 310 U.S. 296, 303, 84 L. ed. 1213, 60 S. Ct. 900, 903; *School District of Abington Township* v. *Schempp,* 374 U.S. 203, 215, 10 L. ed. 2d 844, 83 S. Ct. 1560, 1568.) While the early decisions in this area consider as a unit the First Amendment provisions that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof", the later opinions treat the cases as falling within the Establishment Clause or the Free Exercise Clause. It has been held that governmental actions cannot be proscribed under the latter clause unless they are demonstrated to have a coercive effect upon the individual, but the presence of that effect here is self-evident.

The motivating factors underlying the constitutional separation of church and State and the prohibitions against governmental interference in matters of religion emanated from the circumstances prevailing in many European countries during precolonial ages, and from the practices among the colonies themselves prior to federation. The cruel and oppressive measures adopted, and the punishments imposed to compel conformity of all religious beliefs to those held by the most numerous or powerful groups are too well known to require documentation. Even the colonial governments legislated in this area, or attempted to do so, taxing inhabitants against their will for the support of religion or a particular sect, compelling attendance at worship meetings with various penalties including death provided for those who failed or refused to comply, and punishing those nonconformists whose opinions were considered heretical. The controversy culminated in the First Amendment's guar-

antee to the individual of freedom from governmental domination in his religious beliefs and practices, and the point at which interference therewith may be constitutionally permissible is well illustrated by the proceedings of the Virginia House of Delegates. That body, after a spirited debate, adopted a bill "for establishing religious freedom" drafted by Thomas Jefferson (1 Jeff. Works 45; 2 Howison, Hist. of Va. 298) the preamble of which stated (12 Hen. Stat. 84) "to suffer the civil magistrate to intrude his powers into the field of opinion, and to restrain the profession or propagation of principles on supposition of their ill tendency, is a dangerous fallacy which at once destroys all religious liberty" and "it is time enough for the rightful purposes of civil government for its officers to interfere when principles break out into overt acts against peace and good order". The line of demarcation between that which may and that which may not be proscribed as set forth in the concluding portion of this quotation has been manifest in the philosophy of this nation and decisions of its courts during the intervening years. *Reynolds* v. *United States,* 98 U.S. 145, 25 L. ed. 244; *Davis* v. *Beason,* 133 U.S. 333, 33 L. ed. 637.

Appellees argue that society has an overriding interest in protecting the lives of its citizens which justifies the action here taken. As supporting this conclusion they rely upon the compulsory vaccination cases (*e.g. Jacobson* v. *Massachusetts,* 197 U.S. 11, 49 L. ed. 643, 25 S. Ct. 358); the polygamous marriage proscriptions (*Reynolds* v. *United States,* 98 U.S. 145, 25 L. ed. 244, *Davis* v. *Beason,* 133 U.S. 333, 33 L. ed. 637); those cases sustaining statutes prohibiting the handling of snakes during religious rituals (*Lawson* v. *Commonwealth,* 291 Ky. 437, 164 S.W.2d 972; *Harden* v. *State,* 188 Tenn. 17, 216 S.W.2d 708); *People ex rel. Wallace* v. *Labrenz,* 411 Ill. 618, wherein we upheld the appointment of a guardian who consented to a blood transfusion administered to the minor child of members of

Jehovah's Witnesses; and *Application of President and Directors of Georgetown College, Inc.* (D.C. cir.) 331 Fed.2d 1000, *cert.* denied 84 S. Ct. 1883, involving a blood transfusion to an adult member of the same sect.

These cases are not determinative of the instant issue, and some are, in fact, supportive of a conclusion contrary to that urged by appellees. We believe the compulsory vaccination cases inapposite since society clearly can protect itself from the dangers of loathsome and contagious disease, a question with which we are not concerned; the polygamous marriage bans were upheld because the practice consisted of overt acts determined to be deleterious to public morals and welfare (no overt, immoral activity appears here); the *Lawson* and *Harden* "snake handling" prohibitions also involved affirmative action deemed detrimental to the public welfare; and *Labrenz* involved blood transfusions to a minor child; the *Georgetown College* case was an altogether unique proceeding in which a single Federal Court of Appeals judge entered an order allowing a blood transfusion to an adult member of Jehovah's Witnesses. A doctor and hospital authorities had appeared originally before a Federal district judge and orally requested entry of an order permitting blood transfusions to be administered to a patient evidently *in extremis*. The request was denied. Later that same day, an "appeal" was taken to a single Court of Appeals judge, and the same order was requested of him. In reaching his determination, the judge went to the hospital and spoke with the patient and her husband. The husband said that while his wife was obliged to "abstain from blood", if the court ordered a transfusion, the matter would be out of his hands. The patient stated that the transfusion would be against her will, but she also intimated that the court could take the matter from her hands. The judge then entered the order, determining to "act on the side of life".

In subsequently denying a petition for rehearing *en*

*banc,* the opinions filed by other members of that court indicate their misgivings regarding the substantive and procedural aspects of the action taken. Contrary to appellee's interpretation, we read the opinions as suggesting a majority of the court would have refused the order. However, irrespective of the merits of that case, it is readily distinguishable from the instant one. There, the person alleged to be *in extremis* was the mother of minor children. The State might well have an overriding interest in the welfare of the mother in that situation, for if she expires, the children might become wards of the State. Such reasoning is inapplicable here since all members of the Brooks family are adults.

Similarly, the holding of the New Jersey Supreme Court (*Raleigh Fitkin-Paul Morgan Memorial Hosp.* v. *Anderson,* 42 N.J. 421, 201 A. 2d 537 (1964), *cert.* denied, 377 U.S. 985) authorizing blood transfusions for a nonconsenting Jehovah's Witnesses member who was quick with child is not here persuasive since the court there held it unnecessary to determine whether the mother could be compelled to accept a transfusion to save her own life because it was so inextricably interwoven with that of the child as to render it impracticable to distinguish between them.

We believe Jefferson's fundamental concept that civil officers may intervene only when religious "principles break out into overt acts against peace and good order" has consistently prevailed in varying forms since *Reynolds* v. *United States* and *Davis* v. *Beason.*

In *Cantwell* v. *Connecticut,* 310 U.S. 296, 84 L. ed. 1213, 60 S. Ct. 900, where a statute imposed unconstitutional conditions upon fund solicitation for religious purposes, the court said at page 903 (S. Ct.) in speaking of the First Amendment safeguard of the free exercise of any chosen form of religion: "Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second can-

not be. Conduct remains subject to regulation for the protection of society." But the court there found no "clear and present danger" appeared.

In *Prince* v. *Massachusetts,* 321 U.S. 158, 88 L. ed. 645, 64 S. Ct. 438, the judicial difficulties inherent in a delineation of the boundary line between those expressions of religious convictions in the form of public acts which may be suppressed and those which are constitutionally protected were well demonstrated in a 5-4 opinion upholding a statute of Massachusetts against the contention that a child member of Jehovah's Witnesses was constitutionally protected by the First Amendment in selling the organization's magazines on the streets. The court there based its decision upon the injury to society involved in knowingly permitting a child of tender years to violate the child labor laws and the hazards involved in permitting such child upon the public streets. While there stating that "the state's authority over children's activities is broader than over like action of adults", the court's decision was apparently prompted by the majority's belief that State action impinging upon a claimed religious freedom is sustainable when shown to be necessary for or conducive to society's protection against some clear and present danger.

In *West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624, 87 L. ed. 1628, 63 S. Ct. 1178, the court nullified a mandatory school program requiring all students to salute the flag and recite the pledge of allegiance. The basis therefor was a violation of the constitutional guarantees of freedom of speech and freedom of woreship. The language of the majority opinion at page 1187 (S. Ct.) is apt: "We can have intellectual individualism and the rich cultural diversities that we owe to exceptional minds only at the price of occasional eccentricity and abnormal attitudes. When they are so harmless to others or to the State as those we deal with here, the price is not too great. But freedom to differ is not limited to things that do not matter much.

That would be a mere shadow of freedom. *The test of its substance is the right to differ as to things that touch the heart of the existing order.* [Emphasis added]. If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein". Also appropriate is the language of the specially concurring opinion of Justices Black and Douglas at page 1188: "No well ordered society can leave to the individuals an absolute right to make final decisions, unassailable by the State, as to everything they will or will not do. The First Amendment does not go so far. Religious faiths, honestly held, do not free individuals from responsibility to conduct themselves obediently to laws *which are either imperatively necessary to protect society as a whole from grave and pressingly imminent dangers* or which, without any general prohibition, merely regulate time, place or manner of religious activity". (Emphasis added)

In *School District of Abington Township* v. *Schempp,* 374 U.S. 203, 10 L. ed. 2d 844, 83 S. Ct. 1560, 1572, a school prayer case decided under the Establishment Clause of the First Amendment, the court in commenting on the Free Exercise Clause stated on page 1574 (S. Ct.) : "The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard. In the relationship between man and religion, the State is firmly committed to a position of neutrality".

In addition to the factors apparent in the decisions quoted from, the concurring opinion of Mr. Justice Brennan in the *Schempp* case poses another distinction when at page

1586 he states: "But we must not confuse the issue of governmental power to regulate or prohibit conduct *motivated by religious beliefs* with the quite different problem of governmental authority to compel behavior *offensive to religious principles."*

We have quoted at some length from these decisions in order to demonstrate what we believe to be the controlling elements in controversies akin to that now before us. It seems to be clearly established that the First Amendment of the United States Constitution as extended to the individual States by the Fourteenth Amendment to that constitution, protects the absolute right of every individual to freedom in his religious belief and the exercise thereof, subject only to the qualification that the exercise thereof may properly be limited by governmental action where such exercise endangers, clearly and presently, the public health, welfare or morals. Those cases which have sustained governmental action as against the challenge that it violated the religious guarantees of the First Amendment have found the proscribed practice to be immediately deleterious to some phase of public welfare, health or morality. The decisions which have held the conduct complained of immune from proscription involve no such public injury and no danger thereof.

Applying the constitutional guarantees and the interpretations thereof heretofore enunciated to the facts before us we find a competent adult who has steadfastly maintained her belief that acceptance of a blood transfusion is a violation of the law of God. Knowing full well the hazards involved, she has firmly opposed acceptance of such transfusions, notifying the doctor and hospital of her convictions and desires, and executing documents releasing both the doctor and the hospital from any civil liability which might be thought to result from a failure on the part of either to administer such transfusions. No minor children are in-

volved. No overt or affirmative act of appellants offers any clear and present danger to society—we have only a governmental agency compelling conduct offensive to appellant's religious principles. Even though we may consider appellant's beliefs unwise, foolish or ridiculous, in the absence of an overriding danger to society we may not permit interference therewith in the form of a conservatorship established in the waning hours of her life for the sole purpose of compelling her to accept medical treatment forbidden by her religious principles, and previously refused by her with full knowledge of the probable consequences. In the final analysis, what has happened here involves a judicial attempt to decide what course of action is best for a particular individual, notwithstanding that individual's contrary views based upon religious convictions. Such action cannot be constitutionally countenanced.

It is well stated in *Barnette* v. *West Virginia State Board of Education,* 47 F. Supp. 251, 253 (aff'd. 319 U.S. 624): "Courts may decide whether the public welfare is jeopardized by acts done or omitted because of religious belief; but they have nothing to do with determining the reasonableness of the belief. That is necessarily a matter of individual conscience. There is hardly a group of religious people to be found in the world who do not hold to beliefs and regard practices as important which seem utterly foolish and lacking in reason to others equally wise and religious; and for the courts to attempt to distinguish between religious beliefs or practices on the ground that they are reasonable or unreasonable would be for them to embark upon a hopeless undertaking and one which would inevitably result in the end of religious liberty. There is not a religious persecution in history that was not justified in the eyes of those engaging in it on the ground that it was reasonable and right and that the persons whose practices were suppressed were guilty of stubborn folly hurtful to the general

welfare. * * * The religious freedom guaranteed by the First and Fourteenth Amendments means that he shall have the right to do this, whether his belief is reasonable or not, without interference from anyone, so long as his action or refusal to act is not directly harmful to the society of which he forms a part".

And a portion of Judge Burger's opinion (joined in by Judges Miller and Bastian) in the *Georgetown College* case (331 F. 2d 1000) at page 1016 is here appropriate: "Mr. Justice Brandeis, whose views have inspired much of the 'right to be let alone' philosophy, said in Olmstead v. United States, 277 U.S. 438, 478, 48 S. Ct. 564, 572, 72 L. ed. 944 (1928), (dissenting opinion): 'The makers of our Constitution * * * sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized man.' Nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to *sensible* beliefs, *valid* thoughts, *reasonable* emotions, or *well-founded* sensations. I suggest he intended to include a great many foolish, unreasonable and even absurd ideas which do not conform, such as refusing medical treatment even at great risk".

While the action of the circuit court herein was unquestionably well-meaning, and justified in the absence of decisions to the contrary, we have no recourse but to hold that it has interfered with basic constitutional rights.

Accordingly, the orders of the probate division of the circuit court of Cook County are reversed.

*Orders reversed.*