**Miriam WINTERS, on behalf of herself and all other persons similarly situated, Plaintiff-Appellant,**

**v.**

**Alan D. MILLER, M.D., as Commissioner of Mental Hygiene of the State of New York, et al., Defendants-Appellees.**

**No. 94, Docket 34521.**

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 1970.

Decided May 26, 1971.

■

---

Bruce J. Ennis and William H. Pratt, New York Civil Liberties Union, New York City, for plaintiff-appellant.

Edmund B. Hennefeld (J. Lee Rankin, Corp. Counsel of the City of New York, New York City, Stanley Buchsbaum, New York City, of counsel), for defendant-appellee Thomas.

Joel H. Sachs, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., of counsel), for defendants-appellees Miller and O'Neill.

Before MOORE, SMITH and AN-DERSON, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an appeal from an order of the United States District Court for the Eastern District of New York (Anthony J. Travia, Judge) granting defendants-appellees' motion for summary judgment and dismissing the complaint in an action brought pursuant to the federal civil rights statutes [42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)]. The opinion below is reported at 306 F.Supp. 1158 (1969). We reverse and remand for further proceedings as to the claim for damages resulting from the forced medication in violation of the plaintiff's right to freedom of religion under the First Amendment.

As a preliminary matter we note that jurisdiction is properly founded under 28 U.S.C. § 1343(3) since the rights infringed are unquestionably those of "personal liberty" rather than "property." [Eisen v. Eastman, 421 F.2d 560 (2d Cir. 1969); Johnson v. Harder, 438 F.2d 7 (2 Cir. 1971).]

Miss Miriam Winters is a 59 year-old spinster who has been supported under public assistance for over 10 years. For several years she had lived in a hotel in Brooklyn, New York and had created some difficulty there because of her constant demands that she be given a room with a private bath and because of her alleged failure to maintain a proper state of personal cleanliness.

In early 1967, she was told by her welfare case worker that she could obtain a room with a private bath with the approval of a physician or a psychiatrist. Accordingly, at her request, she was seen by Dr. Robert Reich, a psychiatric consultant to the Department of Welfare. Following this examination Miss Winters was told that she would be given a room with a private bath if she would move to the King Edward Hotel in Manhattan, which she agreed to do, and in mid-April she took up residence there. On May 2, 1968 when Miss Winters attempted to pay her rent for that month she was told by the hotel management that she could not continue to occupy the room she was in but would have to move to another room in the same hotel. This she refused to do, and as a result, the hotel management summoned the police, and she was taken by them to Bellevue Hospital where she was involuntarily admitted pursuant to section 78(1) of the New York Mental Hygiene Law, McKinney's Consol.Laws, c. 27.[1] On May 7, 1968 appellant was examined by two staff psychiatrists at Bellevue who certified her need for care pursuant to section 72(1) of the New York Mental Hygiene Law which provides for commitment for up to 60 days upon the filing of a "two physician certificate."[2]

1. New York Mental Hygiene Law, Section 78(1):

"The Director of any hospital maintaining adequate staff and facilities for the observation, examination, care and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive or retain therein as a patient for a period of thirty days any person alleged to be in need of immediate observation, care, or treatment."

2. New York Mental Hygiene Law, Section 72(1):

"The director of a hospital may receive and retain therein as a patient any person alleged to be mentally ill and suitable for care and treatment upon certificate or certificates of two examining physicians accompanied by an application for the admission of such person executed within ten days prior to such admission by * * * any public welfare officer of the town * * * or in the case of the admission of any such person to a hospital operated by the state or a political subdivision thereof, by the director of such hospital or by the director or head of any other hospital where such person may be."

For 10 years prior to her admission to Bellevue Miss Winters had been a practicing Christian Scientist. When she was admitted she refused to allow a doctor to take her blood pressure stating to him that she was a Christian Scientist, and the Bellevue records contain several references to this fact indicating that the hospital clearly had notice of her religious beliefs. In spite of this, however, and over her continued objections she was given medication (for the most part rather heavy doses of tranquilizers, both orally and intramuscularly) continually from the time of her admission until she was discharged on June 18, 1968. On May 13, 1968 she was transferred from Bellevue to the Central Islip State Hospital on Long Island. Again the record clearly indicates that she brought her objections to physical medication to the attention of the hospital staff, but her protests were ignored.

The primary question raised in this appeal is whether appellant's constitutional rights were violated when she was given medical treatment over her objections, which were religious in nature, and whether she is therefore entitled to relief under the federal civil rights statutes.

It should be emphasized at the outset that appellant had never been found by any court to be "mentally incompetent," nor, so far as the record shows, were any facts alleged by the medical personnel who attended her which would justify a finding by a court of "mental incompetence." Neither did any court ever find that she was "mentally ill," although the two physicians who examined her (pursuant to section 72(1)) did state that in their opinion she was suffering from a "mental illness."

■ However, the law is quite clear in New York that a finding of "mental illness" even by a judge or jury, and commitment to a hospital, does not raise even a presumption that the patient is "incompetent" or unable adequately to manage his own affairs. Absent a specific finding of incompetence, the mental patient retains the right to sue or defend in his own name, to sell or dispose of his property, to marry, draft a will, and, in general to manage his own affairs.[3] Sengstack v. Sengstack, 4 N. Y.2d 502, 176 N.Y.S.2d 337, 151 N.E.2d 887 (1958); Finch v. Goldstein, 245 N. Y. 300, 157 N.E.146 (1927).

■ It is clear and appellees concede that if we were dealing here with an ordinary patient suffering from a physical ailment, the hospital authorities would have no right to impose compulsory medical treatment against the patient's will and indeed, that to do so would constitute a common law assault and battery. The question then becomes at what point, if at all, does the patient suffering from a mental illness lose the rights he would otherwise enjoy in this regard.

The court below was apparently of the view that *any* patient alleged to be suffering from a mental illness of *any* kind (even those confined under the "emergency" provisions of section 78(1) where the allegations of mental illness need not be made by a physician) loses the right to make a decision on whether or not to accept treatment. Judge Travia reasoned as follows:

In mental cases, the public interest in treating and caring for patients is greater than the public interest in cases of physical illness. Most patients who are physically ill will be able to determine that they need treatment and, when informed by their physicians, will be able to make a reasoned decision as to the type of treatment to which they wish to subject themselves. But a mental patient, because of the nature of his illness, may be unable either to seek appropriate treatment or to determine what treatment to allow. For the physically ill person, where there are no dependent children or communicable diseases in-

---

3. Of course, certain prior actions of persons adjudged mentally incompetent may subsequently be found voidable once incompetency is judicially established.

volved, the danger from a refusal on religious or any other grounds to allow a particular type of treatment may be that the patient will die. Only the patient and his immediate family are likely to be aggrieved or injured as a result. On the other hand, where the mental patient is not properly treated, the condition may progressively worsen, and the patient may become a public burden and expense. Badly needed beds in mental hospitals may be occupied by those (few or many) who refuse treatment which competent and expert medical practitioners prescribe. Where the proposed treatment is conducive or necessary for the cure or amelioration of mental illness, the failure to provide it would be a step backward in the history of mental hygiene. [App. p. 124a].

██ Appellant argues, however, that if we concede the right of others to refuse treatment because they are Christian Scientists or hold similar religious views in this regard, then in the present case, where there is clear evidence that appellant's religious views pre-dated by some years any allegations of mental illness and where there was no contention that the current alleged mental illness in any way altered these views, there is no justification for defendants-appellees substituting their own judgment for that of their patient. The Illinois Supreme Court in In Re Brooks Estate, 32 Ill.2d 361, 205 N.E.2d 435 (1965) recently considered this question at some length.

When approaching death has so weakened the mental and physical faculties of a theretofore competent adult without minor children that she may properly be said to be (legally) incompetent, may she be judicially compelled to accept treatment of a nature which will probably preserve her life, but which is forbidden by her religious convictions, and which she has previously steadfastly refused to accept knowing death would result from such refusal? [205 N.E.2d at 438].

The court answered this question in the negative and ruled that even if she were found to be legally incompetent, she nevertheless was entitled to refuse treatment because of her religious beliefs.

To what extent then may the state constitutionally compel actions which violate an individual's religious beliefs? The Supreme Court has here, as in a number of other areas, arrived at an "ad hoc" balancing test which examines the facts of each particular case to establish the contours of the free exercise clause rather than attempting to formulate any *per se* rules. The leading case is Mr. Justice Jackson's opinion in West Virginia State Bd. of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L. Ed. 1628 (1943).

In weighing the arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases where it is applied for its own sake. The test of legislation which collides with the principles of the First is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include so far as the due process test is concerned, power to impose all the restrictions which the legislature may have a "rational basis" for adopting. But freedom of speech and of the press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case. [319 U.S. at 639, 63 S.Ct. at 1186].

It is precisely the same error of reasoning suggested by Mr. Justice Jackson that appellees and the court below made in the present case. At most, the arguments and cases on which they rely support the finding of a "rational basis" for the state acting in the way it did in the circumstances of Miss Winters' case, but First Amendment rights do not rest on such "slender grounds."

The appellees suggest a number of similar situations where the courts have held that the state's interest outweighs any First Amendment rights. [E. g. Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (compulsory vaccination); Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (violation of the child labor laws); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878) (polygamy); People v. Handzik, 410 Ill. 295, 102 N.E.2d 340 (1951) (criminal prosecution of faith healers who practice medicine without a license); People v. Pierson, 176 N.Y. 201, 68 N.E. 243 (1903) (serious illness of a child). These cases are, however, inapposite for each involved a clear interest, either on the part of society as a whole or at least in relation to a third party, which would be substantially affected by permitting the individual to assert what he claimed to be his "free exercise" rights. In the present case, the state purports to find an "overriding secular interest of public health and welfare" in the "care and treatment of persons suffering from a mental disorder or defect and [in] the protection of the mental health of the state." Yet there is no evidence in the record that would indicate that in forcing the unwanted medication on Miss Winters the state was in any way protecting the interest of society or even any third party. The appellees rely on the fact that the Bellevue authorities found that she was "possibly" harmful to herself and to others. (This conclusion was indicated on one medical form after *one* examination, although at all other examinations conducted while she was hospitalized there was no indication

of such tendencies.) Appellant, however, is not suggesting in this case that the authorities could not legally retain her in the hospital, but rather only that her First Amendment rights were violated as a result of compulsory medication.

The appellees also rely on Judge Skelly Wright's decision in Application of President and Directors of Georgetown College, Inc., 118 U.S.App.D.C. 80, 331 F.2d 1000 rehearing denied, 118 U.S. App.D.C. 90, 331 F.2d 1010, cert. denied, Jones v. President and Directors of Georgetown College, Inc., 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964). There the patient had refused a blood transfusion on religious grounds where she "was *in extremis* and hardly *compos mentis* at the time in question." What appellees neglect to mention, however, is that Judge Wright was very careful to limit his action to the extreme circumstances there present.

> The final, and compelling, reason for granting the emergency writ was that a life hung in the balance. There was no time for research and reflection. Death could have mooted the cause in a matter of minutes, if action were not taken to preserve the status quo. To refuse to act, only to find that the law required action, was a risk I was unwilling to accept. [331 F.2d at 1009–1010.]

Finally, the appellees argue that the state was acting as *parens patriae* with respect to Miss Winters and therefore had the responsibility as well as the right to decide what was best for her under the circumstances. It is the state's *parens patriae* power which had been the legal basis for the long series of court decisions which have denied parents absolute religious freedom with respect to various aspects of the care and upbringing of their children. The appellees go on to state "[i]n the area of mental health too, the State assumes the ultimate responsibility for the care of its citizens. It is fundamental to New York and federal law that the State

acts in *parens patriae* as concerns mentally incompetent persons."

■ The basic fallacy of appellee's case thus becomes obvious. While it may be true that the state could validly undertake to treat Miss Winters if it did stand in a *parens patriae* relationship to her and such a relationship may be created if and when a person is found *legally* incompetent, there was never any effort on the part of appellees to secure such a judicial determination of incompetency before proceeding to treat Miss Winters in the way they thought would be "best" for her. As appellant points out, even if there is some way to find the kind of compelling state interest required to override the First Amendment, there clearly was not a compelling interest in so summarily forcing her to do so. Regular hearings of the New York Supreme Court are held in Bellevue Hospital every Tuesday morning. Plaintiff was admitted on Thursday evening. If appellees had respected her wishes for only four days, they could have brought her before the court for judicial resolution of the issue. At this hearing the appellant might have been able to persuade the court that she was not mentally ill. Or the court might have found that other alternatives would suffice. Under our Constitution there is no procedural right more fundamental than the right of the citizen, except in extraordinary circumstances, to tell his side of the story to an impartial tribunal. As Mr. Justice Frankfurter noted in his concurrence in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951):

> This Court is not alone in recognizing that the right to be heard before being condemned to suffer grievous loss of any kind even though it may not involve the stigma and hardship of a criminal conviction, is a principle basic to our society.

Having concluded, therefore, that the appellant has stated a claim on which relief may be granted, we remand the case to the district court with instructions that it proceed to trial on the merits.

■ The appellant also challenges the constitutional validity of the New York statute which provides for the compulsory fingerprinting and photography of state mental patients. Under section 34(9) of the Mental Hygiene Law the director of each state hospital is required within three days of admission to record the fingerprints and photograph every patient, whether admitted on a voluntary or involuntary basis. One copy of these is kept at the hospital and a second copy is filed with "any other state agency maintaining a fingerprint file."

The justification for this procedure offered by appellees is as follows:

> Fingerprinting and photography of those individuals committed to State mental hospitals may be seen as needed devices to aid in identification of patients, identification of former patients at State mental hospitals, and the possible discovery of prior criminal convictions (which might be necessary to uncover or aid in proper diagnosis and treatment).

Appellant contends that this procedure violates her Fourth Amendment right to privacy, her Fifth Amendment right to substantive and procedural due process, and her Fourteenth Amendment right to equal protection of the laws.

The result sought by appellant, however, is precluded by Judge Weinfeld's recent opinion in Thom v. New York Stock Exchange, 306 F.Supp. 1002, aff'd *per curiam,* Miller v. New York Stock Exchange, 425 F.2d 1074 (2d Cir. 1970), cert. denied, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). These plaintiffs were challenging the constitutionality of the New York statute requiring the fingerprinting of employees of member firms of all national security exchanges. Judge Weinfeld noted:

> Plaintiffs' contention that fingerprinting is an affront to their dignity and an invasion of their privacy is without substance. The day is long

past when fingerprinting carried with it a stigma or any implication of criminality. Federal and state courts alike, in upholding fingerprinting requirements, have rejected any such view. Our Court of Appeals, almost forty years ago, in upholding the right of federal agents to take fingerprints after an arrest upon probable cause, even in the absence of statutory authority, observed, "Fingerprinting is used in numerous branches of business and of civil service, and is not in itself a badge of crime." 306 F.Supp. at 1007–1008.

Appellant attempts to distinguish this case by arguing that "no stigma is ordinarily attached to employment by stock exchange firms [while] the case is quite the contrary with confinement in mental hospitals." Absent some specific illustrations, however, appellant's argument that adverse collateral consequences will follow is mere conjecture.

The case is reversed and remanded with direction that the district court proceed to trial.

MOORE, Circuit Judge (concurring in part and dissenting in part):

I concur only in the portion of the majority opinion which holds that the appellant's constitutional rights were not violated when she was fingerprinted and photographed at Central Islip State Hospital, pursuant to § 34(9) of the Mental Hygiene Law of New York.

I dissent as to the court's determination that it should reverse the trial court's grant of defendants-appellees' motion for summary judgment and, in effect, granting summary judgment for the plaintiff. I dissent on two grounds: first, because whether or not plaintiff's free exercise rights were violated, there is no appropriate relief which may be granted and hence the appeal should have been dismissed, and second, because plaintiff has failed to demonstrate an unjustified denial of any constitutional right.

I.

There are three named defendants in this case. They are: Alan D. Miller, M.D., Commissioner of Mental Hygiene of the State of New York, Alexander Thomas, M.D., Director of the Psychiatric Division, Bellevue Hospital and Francis J. O'Neill, M.D., Director of Central Islip State Hospital. As to these three defendants, it is entirely clear that money damages are completely inappropriate since there is no showing whatever that they in any way condoned the administration of drugs to the plaintiff. It is not shown that any of them had any information whatever as to the beliefs held by Miss Winters, or for that matter the treatment being accorded to her. All the record shows is that she brought her objections to certain members of the staff of each hospital, presumably the defendants "doctors on the staffs of Bellevue Hospital and Central Islip State Hospital whose names are unknown to plaintiff." Assuming, as the majority finds, plaintiff's constitutional rights were violated, an action under § 1983 might be justified against the particular individuals who, acting under color of state law, unjustifiably violated plaintiff's constitutional rights. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). The named defendants were not such persons. In our recent decision in Sostre v. McGinnis, 442 F.2d 178 (1971), we held that Paul D. McGinnis, Commissioner of Corrections of the State of New York could not be held liable under § 1983 for damages notwithstanding that he knew of the fact of Sostre's confinement in segregation since the record, while demonstrating that Warden Follette had (as the majority found) detained Sostre in segregation because of his legal actions against the Warden and because of his political beliefs, did not demonstrate that McGinnis had been informed of these underlying reasons for Sostre's confinement, although McGinnis did know of the fact of such confinement. As with McGinnis in *Sostre,* the named

defendants herein were not shown to have been informed of the circumstances which led the majority herein to conclude that plaintiff's rights were violated. In fact not only was there no showing that these defendants were aware of the plaintiff's religious beliefs but also there was no showing that these defendants were in any way aware of the treatment afforded Miss Winters.

To whatever extent, if any, the doctrine of "command responsibility" survives in the area of military affairs, that doctrine can have no applicability to the chain of responsibility in the state executive branch.

None of the "doctors on the staffs of Bellevue Hospital and Central Islip State Hospital whose names are unknown to plaintiffs" can be held by this court to be liable for damages since no such person or persons have been served.

Therefore, there is no basis for granting damages to anyone currently before this court. Furthermore, since Miss Winters is no longer under the control of any of the defendants, and there is no showing that she is likely to be brought under such control, it is clear that injunctive relief is also not in order. Similarly, declarative relief is inappropriate since there is no existing controversy.

The majority concludes "that the appellant has stated a claim on which relief may be granted" and thus "remand[s] the case to the district court with instructions that it proceed to trial on the merits." Based on the foregoing analysis, and barring any new evidence indicating injunctive or declarative relief may be appropriate, the district court may well conclude that no relief whatever is appropriate. However, I believe that we should have made this determination on the record before us and dismissed the appeal as moot as to the named defendants and for lack of jurisdiction over the person as to the unnamed defendants. In failing to make this determination, this Court has, in effect, issued declarative relief without a present controversy.

## II

Furthermore, the majority in my judgment, is not correct in its conclusion that plaintiff was in any way unjustifiably denied her constitutional rights.

After asserting, in effect, that there is no basis here for finding Miss Winters to be possibly harmful to herself and others, the majority suggests that "it may be true that the state could validly undertake to treat Miss Winters if it did stand in a *parens patriae* relationship to her" and that "such a relationship may be created if and when a person is found *legally* incompetent," and not by a proceeding under §§ 72(1) or 78(1).

Does the majority mean by this that a person who is deemed to be potentially harmful to others could not, even in an emergency situation, be given appropriate drugs to reduce the likelihood of such anti-social conduct in the absence of an adversary judicial determination of incompetence? In the face of danger to herself and others, must Bellevue's harried medical staff seek out a judge whenever the police present them with a person whose mental condition requires that she receive tranquilizers or other drugs to protect herself and others or do they mean that a person can be given drugs against his stated religious convictions in at least some circumstances where the patient has not been declared legally incompetent by judicial adversary determination?

I disagree in any event with the majority's implicit conclusion that, based on the record as it was before the court on the motion of defendants for summary judgment, the treating doctors were not justified in concluding that the medical treatment administered was not in the best interests of the patient and, on the contrary, would hold that this determination, being valid, justified the medical care given Miss Winters. The Millsian distinction between instances of harm to others and instances of harm solely to self, relied on by the majority, would seem rarely if ever to be relevant

in actuality because others are affected by virtually any action which an individual takes or fails to take. Thus, while Miss Winters might not have been likely to perpetrate a violent attack on her fellow patients had she not received the tranquilizers here involved, the very conduct which led to her admission, if repeated in the ward, might well have been disruptive to the recovery of others in her ward, who themselves may have been suffering from psychological defects. Second, even if no one other than Miss Winters would have been directly aided by the treatment for the condition for which she was admitted, as Judge Travia pointed out in his opinion below, if mentally ill persons are not accorded proper treatment, their "condition may progressively worsen, and the patient may become a public burden and expense."[1]

More fundamentally, I believe that a § 78(1) admission, as well as a two-physician admission under § 72(1) constitutes a quasi-judicial determination under state law authorizing medical care of an individual notwithstanding her lack of consent thereto. The majority, while conceding that after a proper proceeding, such as New York's procedure for the adjudication of incompetence, it "may" be permissible for the state to administer involuntary medical care notwithstanding the religious view of the patient on a *parens patriae* basis (presumably without having to demonstrate any likelihood that the patient is dangerous to others) suggests that the §§ 78 and 72 procedures are inadequate from a due process point of view to justify such a *parens patriae* role. However, regardless of the validity of such

determination from a due process point of view, the staff of the two hospitals here involved should be entitled to rely on such quasi-judicial authorization. Furthermore, plaintiff has explicitly chosen not to challenge the constitutional validity of the procedures under §§ 78 and 72. The majority suggests, in effect, that even assuming the validity of these determinations under §§ 78 and 72, their effect must, as a constitutional matter, be diminished so as not to provide for forced medical treatment in cases of religious objection because New York has chosen to allow mentally ill persons undergoing involuntary medical care under these two sections to continue to exercise rights over property pending adjudication of "incompetence." With this conclusion I disagree.

That New York separates medical and legal aspects of the problem of mentally ill persons and provides for separate determinations in each area merely shows its enlightenment, since appropriate medical care hopefully might enable a person to continue to conduct his own affairs in other respects. The two-physician certificate procedure of § 72(1) is subject to a judicial hearing. That procedure at least should meet the majority's concern that the patient be afforded an opportunity "to tell his side of the story." The § 78(1) emergency admission procedure is not an adversary proceeding but obviously due process does not preclude preliminary relief in an emergency situation on an *ex parte* basis, including the right to administer involuntary medical treatment.[2]

In my view, Judge Travia has in a well-reasoned opinion based upon a sound analysis of the law and the facts

---

1. The effects on others thus pointed out are at least as significant as the effects involved in similar cases in the past. Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438 (1944) [economic effect on others of giving jobs to the few minors with real religious objections to child labor laws probably minimal]; Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878) [speculative whether polyg-

amous relationship harms children of such union; harm to society minimal where permission for such marriages conditioned on religious viewpoint].

2. As noted, the admission procedures here involved are specifically not challenged by the appellant. Furthermore, § 78 has been amended since the time of the hospitalization of Miss Winters.

reached the correct decision and, accordingly, I would affirm the order of the district court. I would also dismiss the appeal as moot as to the named defendants and for lack of jurisdiction over the person as to the unnamed defendants.