IN RE MILTON.

[Cite as In re Milton (1987), 29 Ohio St. 3d 20.]

(No. 86-1218—Decided February 20, 1987.)

*Anthony J. Celebrezze, Jr.,* attorney general, and *J. Michael Evans,* for appellee Department of Mental Health.

*Ronald L. Smith,* for appellant.

*G. Michael Kirkman* and *Bruce A. Campbell,* urging reversal for *amicus curiae,* American Civil Liberties Union of Ohio Foundation, Inc.

WRIGHT, J.   This is a case of first impression in Ohio. Several difficult and delicate questions are before us, including whether a state acting through its courts may compel an individual to submit to medical treatment which is arguably life-extending in derogation of that individual's religious beliefs. We must also decide whether the court below infringed upon appellant's constitutional right of religious freedom in citing the essence of her belief in faith healing as evidence of her lack of capacity to provide informed consent to medical treatment. We believe these questions should be resolved in favor of appellant and, thus, we reverse the holding of the appellate court.

At the outset, we emphasize that at no time has any court found appellant to be incompetent under state law. Appellant is a voluntary patient of the hospital. However, even if she were to be involuntarily committed, that commitment would not be tantamount to a finding of incompetency. Commitments to a mental institution and adjudications of incompetency are distinct legal proceedings which determine separate issues and often lead to different results. Commitment proceedings focus on proof of dangerousness as the primary determinant of the need for commitment, while incompetency adjudications evaluate a person's cognitive ability to make decisions.[5] "[A] finding of 'mental illness' * * * and commitment to a

---

[5] Incompetency adjudications measure a person's cognitive ability to make a lawful decision regardless of its economic effect on others. In contrast, the major justification for involuntary commitment is protection of society or of the incapacitated individual. See Brakel, Parry & Weiner, The Mentally Disabled and the Law (3 Ed. 1985) 374. R.C. 2111.01 defines an incompetent as "any person who by reason of advanced age, improvidence, or mental or physical disability * * * or mental illness, is incapable of taking proper care of himself or his property * * *."

hospital, does [*sic*] not raise even a presumption that the patient is 'incompetent' or unable adequately to manage his own affairs." *Winters* v. *Miller* (C.A. 2, 1971), 446 F. 2d 65, 68. Thus, a person who is not in a mental institution may be found to be incompetent, and a person properly committed to a mental institution may be legally competent.

Persons admitted to mental hospitals retain all civil rights not specifically denied by statutes or removed by separate adjudications of incompetency. R.C. 5122.301. These civil rights include the right to sue or defend in one's own name, sell or dispose of property, marry, draft a will, freely practice one's religion, and refuse medical treatment for religious reasons. See *Winters* v. *Miller, supra.* In *Winters,* a case factually similar to our own, a Christian Scientist, who was committed to a mental hospital, but who had not been adjudicated incompetent, refused to consent to medical treatment on the basis of her religious beliefs. The court discussed the requirement that only a " ['] grave and immediate danger to interests which the state may lawfully protect ['] " (*id.* at 69) can justify a state's interference with the freedom of religion and held that "there is no evidence in the record that would indicate that in forcing the unwanted medication on Miss Winters the state was in any way protecting the interest of society or even any third party." *Id.* at 70. Thus, it is apparent that the state may not act in a *parens patriae* relationship to a mental hospital patient unless the patient has been adjudicated incompetent.

The fact that appellant has a long-standing delusion that she is Rev. Jenkins' wife and that he will perchance heal her infirmities simply does not strip appellant of her constitutional rights to freely select and adhere to the religion of her choice. The testimony of Dr. Green, the hospital's own witness, supports a conclusion that appellant's belief in spiritual healing stands on its own, without regard to her delusion.[6] Dr. Green explained that appellant's psychosis was "pretty much limited to delusional imaginations" and that "[c]ertain other parts of her seem pretty much intact."

The First Amendment to the United States Constitution and Section 7, Article I of the Ohio Constitution safeguard an individual's freedom to both choose and employ religious beliefs and practices.[7] See *Bd. of Edn. of*

---

[6] Dr. Green testified that appellant could receive the information necessary to consent or not consent to the medical treatment in an intelligent and informed capacity. He noted that she is aware that she has a malignant tumor, but she believes that she will be cured through faith healing. She also made it very clear to Dr. Green that she was a faith healer and did not believe in other methods of treatment. Her belief in spiritual healing is long-standing. She informed Dr. Green that Rev. Jenkins had cured her blindness (which was thought to be hysterical blindness) in the past. Dr. Green explained that he felt spiritual healing is the prime thing in appellant's life and she believes that it would be almost a sin to try anything else.

[7] Section 7, Article I of the Ohio Constitution provides:
"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own conscience. No person shall be compelled to attend, erect, or support

*Cincinnati* v. *Minor* (1872), 23 Ohio St. 211, 250. A person's religious beliefs are protected absolutely. *Cantwell* v. *Connecticut* (1940), 310 U.S. 296, 303. The state may not interfere with the expression of belief, nor may it "compel behavior offensive to religious principles." (Emphasis deleted.) *School Dist. of Abington Twp.* v. *Schempp* (1963), 374 U.S. 203, 250 (Brennan, J., concurring).

While religiously inspired *acts* do not receive absolute protection, "* * * [o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Thomas* v. *Collins* (1945), 323 U.S. 516, 530; *Sherbert* v. *Verner* (1963), 374 U.S. 398, 406; see, also, *Wisconsin* v. *Yoder* (1972), 406 U.S. 205, 215. Freedom of religion may be infringed "only to prevent grave and immediate danger to interests which the State may lawfully protect." *West Virginia State Bd. of Edn.* v. *Barnette* (1943), 319 U.S. 624, 639.

Appellee does not suggest any state interest sufficient to justify interfering with appellant's religiously inspired refusal to consent to medical treatment. Appellee argues that appellant's delusion that she was Rev. Jenkins' spouse negated her religious views and made her entire belief in faith healing a delusion. The court of appeals looked to the content of appellant's religious beliefs and found that her belief in faith healing constituted a delusion. We do not accept this contention.

There is a dichotomy between modern medicine which is scientific and based upon provable theories and religion which is *inherently* mystical, intangible and a matter of individual faith. Yet, the Ohio and United States Constitutions mandate that when the dictates of modern medicine and religious beliefs collide, the conflict be resolved by leaving the medical treatment decision to the individual. As the court stated in *United States* v. *Ballard* (1944), 322 U.S. 78, 86, freedom of religion "embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. * * * Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others."

While there may be a variety of opinions as to the efficacy of spiritual healing through faith, the courts below acknowledged that it is a form of religious belief and practice. We recognize that extending constitutional

---

any place of worship, or maintain any form of worship, against his consent; and no preference shall be given, by law, to any religious society; nor shall any interference with the rights of conscience be permitted."

The First Amendment to the United States Constitution provides as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

The Free Exercise Clause of the First Amendment applies to the states through the Fourteenth Amendment. *Cantwell* v. *Connecticut* (1940), 310 U.S. 296, 303-304. See, also, *School Dist. of Abington Twp.* v. *Schempp* (1963), 374 U.S. 203.

protection to a belief in spiritual healing and other religiously motivated refusals to accept medical treatment can be very troubling to those who do not share these beliefs, since, in cases such as this one, the patient may die as a result of refusing the recommended treatment. "* * * But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order. If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in * * * religion * * * or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Edn.* v. *Barnette, supra,* at 642.

Other jurisdictions have also recognized that an individual's decision to forego traditional medical care and rely on faith healing is encompassed within the freedom of religion. For example, in *In re Estate of Brooks* (1965), 32 Ill. 2d 361, 373, 205 N.E. 2d 435, 442, the Illinois Supreme Court held that compulsory medical treatment, which was in violation of the patient's religious beliefs, no matter how well intentioned, violated the First Amendment's Free Exercise Clause, absent a showing of a substantial state interest. The court reasoned: "Even though we may consider appellant's beliefs unwise, foolish, or ridiculous, in the absence of an overriding danger to society we may not permit interference therewith * * * for the sole purpose of compelling her to accept medical treatment forbidden by her religious principles, and previously refused by her with full knowledge of the probable consequences. In the final analysis, what has happened here involves a judicial attempt to decide what course of action is best for a particular individual, notwithstanding that individual's contrary views based upon religious convictions. Such actions cannot be constitutionally countenanced." *Id.*

Similarly, in *In re Osborne* (D.C. App. 1972), 294 A. 2d 372, a Jehovah's Witness refused to consent for religious reasons to the administration of blood transfusions. The court found that the patient had validly and knowingly chosen this course for his life and there was no compelling state interest which justified overriding that decision. See, also, *Holmes* v. *Silver Cross Hospital* (N.D. Ill. 1972), 340 F. Supp. 125; *In re Melideo* (1976), 88 Misc. 2d 974, 390 N.Y. Supp. 2d 523. Cf. *Raleigh Fitkin-Paul Morgan Memorial Hosp.* v. *Anderson* (1964), 42 N.J. 421, 201 A. 2d 537.

Appellee also suggests that appellant's beliefs are not entitled to protection because she is not a member of any specific religious denomination or sect and is not being treated in accordance with a recognized method of healing. The trial court noted that if appellant were receiving spiritual treatment from Jenkins the court would have been precluded from ordering the medical treatment. However, since she was not actively receiving such spiritual treatment, the court reasoned that it was under no compulsion to recognize appellant's wishes in this matter. Such a distinction is patently in conflict with appellant's constitutional rights. Religious

freedom is one of " 'absolute equality before the law, of all religious opinions and sects * * *. The government is neutral, and, while protecting all, it prefers none, and it disparages none.' " (Emphasis deleted.) *School Dist. of Abington Twp.* v. *Schempp, supra,* at 215. "In such an intensely personal area, * * * the claim of the * * * [believer] that his belief is an essential part of a religious faith must be given great weight." *United States* v. *Seeger* (1965), 380 U.S. 163, 184.

Appellant has expressed a long-standing belief in spiritual healing, and great weight must be given to her statement of her personal beliefs. We cannot evaluate the "correctness" or propriety of appellant's belief. Absent the most exigent circumstances, courts should never be a party to branding a citizen's religious views as baseless on the grounds that they are non-traditional, unorthodox or at war with what the state or others perceive as reality.

The testimony of Dr. Green supports our conclusion that appellant's belief in spiritual healing stands on its own, without regard to any delusion.[8] We can probe no further. Appellant's religious freedom to believe and act according to the dictates of her belief in spiritual healing prevents a court from ordering treatment against her will that would violate her religious beliefs. Thus, we hold that the state may not compel a legally competent adult to submit to medical treatment which would violate that individual's religious beliefs even though the treatment is arguably life-extending. Therefore, the probate court's determination was erroneous and the judgment of the court of appeals upholding it is reversed.[9]

*Judgment reversed.*

MOYER, C.J., SWEENEY, DOUGLAS and H. BROWN, JJ., concur.

LOCHER and HOLMES, JJ., dissent.

HOLMES, J., dissenting. While I am in complete agreement with the

---

[8] See footnote 6, *supra.*

[9] We emphasize that this case involves a religiously motivated choice by an adult. It does not present, and therefore we do not address, the issue of a parent who seeks to deny medical treatment for a child on religious grounds. See, *e.g., Jehovah's Witnesses in the State of Washington* v. *King Cty. Hosp. Unit No. 1* (W.D. Wash. 1967), 278 F. Supp. 488, affirmed (1968), 390 U.S. 598, rehearing denied (1968), 391 U.S. 961.

Appellant also questions the probate court's expansion of the term "surgery" in R.C. 5122.271 to include "radiation treatments." R.C. 5122.271(C) provides that the probate court may approve of surgery for mental hospital patients in the absence of their consent. Appellee contends, and the probate court found, that this term "surgery" encompassed radiation treatments. However, because appellant's belief in faith healing entitled her to protection under the United States and Ohio Constitutions, she cannot be compelled to undergo any medical treatment and, thus, we need not address this issue.

syllabus law and the discussion of such law as contained in the majority opinion, I must dissent therefrom in that I feel the majority has completely misconstrued the facts of this matter and the holding of the lower courts in applying such syllabus law.

I am in agreement that the state may not compel the medical treatment of a person who is capable of making the determination of granting or denying the consent for a surgical activity where such determination is based upon a religious belief, even though such belief is strange or incomprehensible to others. However, where the facts show that an individual is so confused in the thinking process that such belief is not rationally formulated and is an outworking of a psychosis, as held by the trial court and the court of appeals here, then the question is not one of a religious infringement but is instead one of the degree of mental instability.

Both of the testifying psychiatrists agreed that her refusal of medical treatment sprang from her belief that she was the wife of LeRoy Jenkins. While her thinking remained undisturbed in other areas, this fixed delusion had already placed her in one life-threatening situation, *i.e.*, police had discovered her living unsheltered in the open fields. It is the very nature of a psychosis that an ordinary part of the personality becomes the medium of expression for the illness. When a belief becomes fixed as part of such illness, then the patient becomes incapable of rationally assessing danger relative to the fixation. This would be true whether the belief occurred as the more typical paranoid delusion manifesting itself in intense fear and/or violence or, as here, in a delusion based upon ordinarily held religious beliefs. Just as the illness has nothing to do with appellant's beliefs, so also the diagnosis of illness is not a value judgment of her beliefs.

Here the probate court and trial court reasonably found that Nancy Milton was unable because of her confused mental condition to give an informed, intelligent and knowing consent for her surgery. Such a finding should be appealed to this court without the esoteric, constitutional free-exercise-of-religion discussion. Appellant has expressed quite enough to demonstrate to the lower courts, and certainly to this court, that she is *incapable* of making her own medical determination. She has asserted that she is married to LeRoy Jenkins, and that this member of the T.V. and now radio clergy would heal her maladies. However, Jenkins has, by way of press announcement in The Columbus Dispatch, publicly removed himself from this appellant and stated that she needs help from others.

It is my view that Nancy Milton does need help from others, and that the probate court and the court of appeals properly recognized that such help should be forthcoming from the medical profession as appropriately prescribed. Accordingly, I would affirm the probate court and the court of appeals.

LOCHER, J., concurs in the foregoing dissenting opinion.

LOCHER, J., dissenting. I agree with the dissent of Justice Holmes and wish to add a few observations of my own.

Nancy Milton was mentally incapable of receiving information concerning her condition and of consenting to surgery. Dr. Lewis A. Lindner testified at the hearing that the patient had totally denied having a tumor to begin with, and that later she refused to accept that she had it—in spite of her being able to feel it growing in her pelvic area. Dr. Lindner added that her stated reason for refusal was that she was the wife of Rev. LeRoy Jenkins, and that she believed he "would come to the hospital and take her away and heal her supernaturally." It is evident that these psychotic delusions have created an impenetrable "wall" which prevents her from admitting she has the tumor and from consenting to the surgery. For her to consent to surgery would be to deny her belief that LeRoy Jenkins would come and take her away to be healed. Nancy Milton is incapable of surmounting this mental wall created by her own delusions. In conclusion, I am convinced that her refusal to consent to surgery is the result of her delusions concerning LeRoy Jenkins rather than her belief in faith healing.

Accordingly, I dissent.