**[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 176.]**

STEELE, APPELLANT, *v*. HAMILTON COUNTY COMMUNITY MENTAL HEALTH
BOARD, APPELLEE.

**[Cite as *Steele v. Hamilton Cty. Community Mental Health Bd.*, 2000-Ohio-47.]**

*Public welfare—Hospitalization of mentally ill persons—State's interest in
protecting its citizens outweighs an involuntarily committed mentally ill
patient's interest in refusing antipsychotic medication, when—Physician
may order forced medication of an involuntarily committed mentally ill
patient with antipsychotic drugs, when—Court may issue an order
permitting hospital employees to administer antipsychotic drugs against
the wishes of an involuntarily committed mentally ill person, when.*

1. When an involuntarily committed mentally ill patient poses an imminent threat
   of harm to himself/herself or others, the state's interest in protecting its
   citizens outweighs the patient's interest in refusing antipsychotic
   medication. Authority for invoking the state's interest flows from the police
   power of the state.

2. Whether an involuntarily committed mentally ill patient poses an imminent
   threat of harm to himself/herself or others warranting the administration of
   antipsychotic drugs against the patient's will is uniquely a medical, rather
   than a judicial, determination to be made by a qualified physician.

3. A physician may order the forced medication of an involuntarily committed
   mentally ill patient with antipsychotic drugs when the physician determines
   that (1) the patient presents an imminent danger of harm to himself/herself
   or others, (2) there are no less intrusive means of avoiding the threatened
   harm, and (3) the medication to be administered is medically appropriate
   for the patient.

4.  When an involuntarily committed mentally ill patient, who does not pose an imminent threat of harm to himself/herself or others, lacks the capacity to give or withhold informed consent regarding his/her treatment, the state's *parens patriae* power may justify treating the patient with antipsychotic medication against his/her wishes. *In re Milton* (1987), 29 Ohio St.3d 20, 29 OBR 373, 505 N.E.2d 255, modified.

5.  Whether an involuntarily committed mentally ill patient, who does not pose an imminent threat of harm to himself/herself or others, lacks the capacity to give or withhold informed consent regarding treatment is uniquely a judicial, rather than a medical, determination.

6.  A court may issue an order permitting hospital employees to administer antipsychotic drugs against the wishes of an involuntarily committed mentally ill person if it finds, by clear and convincing evidence, that (1) the patient does not have the capacity to give or withhold informed consent regarding his/her treatment, (2) it is in the patient's best interest to take the medication, *i.e.*, the benefits of the medication outweigh the side effects, and (3) no less intrusive treatment will be as effective in treating the mental illness.

(No. 99-1771—Submitted June 6, 2000—Decided October 18, 2000.)

APPEAL from the Court of Appeals for Hamilton County, No. C-980965.

_____

{¶ 1} On July 26, 1997, appellant, Jeffrey Steele, was taken by a police officer to University of Cincinnati Hospital ("University Hospital") after appellant's family reported that appellant was "seeing things and trying to fight imaginary foes." After observing appellant, a hospital physician noted that appellant was "responding to internal stimuli," and the physician recommended that appellant be "hospitalized for [the] protection of others and for

stabilization/treatment of psychosis." In accordance with R.C. 5122.10, appellant was detained at University Hospital.

{¶ 2} On July 29, in accordance with R.C. 5122.11, R. Gregory Rohs, M.D., a University Hospital physician, filed an affidavit in the Court of Common Pleas of Hamilton County, Probate Division, stating that appellant, because of his mental illness, posed a substantial and immediate risk of physical impairment or injury to himself as manifested by evidence that he was unable to provide for his basic physical needs. Dr. Rohs's affidavit also stated that appellant had a history of odd and paranoid behaviors, including refusing to eat food prepared by his family, talking to himself, making threats to his family, forcing himself to throw up every morning, and failing to bathe or groom. While detained at University Hospital appellant exhibited substantially identical behavior. Dr. Rohs's affidavit indicated that, while appellant was hospitalized, appellant was withdrawn, did not maintain his hygiene, appeared to have disorganized thought processes, seemed to be responding to internal stimuli, refused medications, and appeared guarded and suspicious. The affidavit concluded that appellant was most likely suffering from paranoid schizophrenia.

{¶ 3} In accordance with R.C. 5122.141, the probate court ordered a hearing, to be held on August 1, on Dr. Rohs's affidavit. The court further ordered that appellant was to be detained at University Hospital pending the outcome of the hearing. Pursuant to R.C. 5122.14, the court appointed a psychiatrist, Cyma Khalily, M.D., as an independent expert to examine appellant and report her findings to the court. An attorney was appointed to represent appellant. See R.C. 5122.15.

{¶ 4} At the conclusion of the August 1 hearing, the probate court found, by clear and convincing evidence, that appellant was mentally ill, and the court ordered that appellant be committed to a hospital. R.C. 5122.15. As a result of the court's ruling, appellant remained involuntarily hospitalized at University Hospital.

**{¶ 5}** Thereafter, University Hospital sought an order from the probate court permitting appellant's transfer to the Pauline Warfield Lewis Center ("Lewis Center"). The motion stated that the transfer was in appellant's best interest because, due to his mental illness, appellant was unable to comply with his required treatment and he needed long-term treatment and/or forced medication care. The probate court granted University Hospital's motion, and appellant was transferred to the Lewis Center on August 12.

**{¶ 6}** On September 26, appellee, Hamilton County Community Mental Health Board, sought a court order permitting the Lewis Center employees to administer antipsychotic medication[1] to appellant without his informed consent. A hearing on the motion for forced medication was held on October 31.

**{¶ 7}** Three psychiatrists testified at the hearing: Dr. Michael Newton, appellant's treating physician at the Lewis Center; Dr. Paul Keck of University Hospital; and Dr. Cyma Khalily, the psychiatrist appointed by the probate court. All three physicians testified that appellant was suffering from a form of schizophrenia, that in the hospital environment appellant was *not* an immediate danger to himself or others, that appellant lacked the capacity to give or withhold informed consent, that antipsychotic medication was the only effective treatment for appellant's illness, that the benefits of the medication outweighed the side effects, and that appellant's illness, without treatment, prevented him from being released from the hospital.

---

1. As used in this case, the term "antipsychotic medication" refers to medications such as Haldol, Prolixin, and Trilafon that are used in treating psychoses, especially schizophrenia. These drugs were introduced into psychiatry in the early 1950s and are effective in treating psychotic disorders because they can bring about chemical changes in the brain. They also often produce adverse side effects, some of which may be controlled by additional medications. The seriousness of the possible side effects of these types of drugs cannot be overstated. For a full discussion, see Cichon, The Right to "Just Say No": A History and Analysis of the Right to Refuse Antipsychotic Drugs (1992), 53 La.L.Rev. 283, 297-311. Appellee's motion for forced medication of appellant included medication (Cogentin) to alleviate side effects caused by the antipsychotic medication.

{¶ 8} At the conclusion of the October 31, 1997 hearing, the magistrate orally denied the motion for forced medication. The magistrate's decision was centered on his finding that appellee had not shown by "clear and convincing evidence that [appellant] represent[ed] a grave and immediate danger of serious physical harm to himself or others."

{¶ 9} Subsequently, the magistrate, on December 3, filed findings of fact and conclusions of law in support of his decision. In part, the magistrate's report concluded that, at the time of the hearing, appellant suffered from a form of schizophrenia that resulted in "a substantial disorder of thought [that] grossly impair[ed] his behavior and judgment," requiring "treatment that include[d] in-patient hospitalization and highly supervised care." The magistrate also found that appellant was not violent or suicidal or disruptive to the ward in any way. In addition, the magistrate found that appellant lacked the capacity to give or withhold informed consent regarding treatment. The magistrate concluded that appellant should not be forcibly medicated.

{¶ 10} Appellee, on December 15, filed objections to the magistrate's findings of fact and conclusions of law, arguing that "a showing of dangerousness is not required by Ohio law or statute in order to grant the authority for forced medications." After hearing arguments on the objections, the probate judge, on February 19, 1998, remanded the matter to the magistrate "for clarification of the Magistrate's Findings of Fact regarding the severity or gravity of [appellant's] mental illness."

{¶ 11} The magistrate's rehearing was held on May 22 and May 29, 1998. Following the rehearing, the magistrate again denied appellee's motion for court-ordered medication of appellant. On November 9,[2] the probate judge filed an

---

2. We set forth all of the pertinent dates of these proceedings to illuminate the lengthy delays, some necessary and some unnecessary, involved in these types of cases. The necessity to make such cases priority matters is obvious.

opinion and entry upholding the magistrate's findings of fact and conclusions of law on rehearing. In its opinion, the court held that Ohio policy only "authorize[d] the forced medication of psychotropic drugs upon a showing that the patient has a serious mental illness, is a danger to his or her self or to others within the institution, and the treatment is in the patient's medical interest."[3]

{¶ 12} On December 8, appellee appealed the probate court's ruling to the Court of Appeals for Hamilton County. The court of appeals reversed the judgment of the probate court and held that "an applicant need not prove that an involuntarily committeed [*sic*] patient poses a risk of danger to himself or others to obtain an order to forcibly medicate the patient, when the applicant has otherwise shown that medication is in the patient's best interest, and when the patient lacks the capacity to give or withhold informed consent for such treatment."

{¶ 13} This cause is now before this court pursuant to the allowance of a discretionary appeal.

———————————

*D. Shannon Smith* and *James R. Bell*, for appellant.

*Faulkner & Tepe* and *A. Norman Aubin*, for appellee.

*Michael Kirkman*, urging reversal for *amicus curiae*, Ohio Legal Rights Service.

———————————

**DOUGLAS, J.**

{¶ 14} The issue in this case is whether a probate court must find that an involuntarily committed mentally ill person is a danger to himself/herself or others

———————————

3. Psychotropic drugs are "compounds that affect the mind, behavior, intellectual functions, perception, moods, and emotions." Winick, The Right to Refuse Mental Health Treatment (1997) 61, citing Kaplan et al., Synopsis of Psychiatry: Behavioral Sciences and Clinical Psychiatry (1994) 410. Antipsychotic drugs are a type of psychotropic drug. Winick at 65; Gutheil & Appelbaum, "Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication (1983), 12 Hofstra L.Rev. 77, 79.

before the court may issue an order permitting employees of the commitment facility to administer antipsychotic medication to the patient against his/her wishes. For the reasons that follow, we find that a court may issue an order permitting the administration of antipsychotic medication[4] against a patient's wishes without a finding that the patient is dangerous when the court finds by clear and convincing evidence that the patient lacks the capacity to give or withhold informed consent regarding treatment, the medication is in the patient's best interest, and no less intrusive treatment will be as effective in treating the mental illness. Accordingly, we affirm the judgment of the court of appeals.

## I

{¶ 15} The right to refuse medical treatment is a fundamental right in our country, where personal security, bodily integrity, and autonomy are cherished liberties. These liberties were not created by statute or case law. Rather, they are rights inherent in every individual. Section 1, Article I of the Ohio Constitution provides that "[a]ll men are, *by nature*, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." (Emphasis added.) Our belief in the principle that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body," *Schloendorff v. Soc. of N.Y. Hosp.* (1914), 211 N.Y. 125, 129, 105 N.E. 92, 93, is reflected in our decisions. See, *e.g.*, *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145 (setting out the test for establishing the tort of lack of informed consent); *In re Milton* (1987), 29 Ohio St.3d 20, 29 OBR 373, 505 N.E.2d 255 (holding that potentially life-saving

---

4. In this opinion we refer to medicating patients with antipsychotic drugs. We wish to make clear that when a court is justified in allowing the administration of antipsychotic drugs against the patient's wishes, it is also justified in allowing, against the patient's wishes, the administration of those medications necessary to alleviate side effects of the antipsychotic drugs.

treatment for cancer could not be forced upon mentally ill person who had the capacity to give or withhold informed consent).

{¶ 16} In *Washington v. Harper* (1990), 494 U.S. 210, 221, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178, 198, the United States Supreme Court determined that persons suffering from a mental illness have a "significant liberty interest" in avoiding the unwanted administration of antipsychotic drugs. That liberty interest is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *Id*. at 221-222, 110 S.Ct. at 1036, 108 L.Ed.2d at 198. Likewise, Section 16, Article I of the Ohio Constitution encompasses due process language that provides substantially the same safeguards as does the Fourteenth Amendment.

{¶ 17} The right to refuse medication, however, is not absolute and it must yield when outweighed by a compelling governmental interest. *Cruzan v. Dir., Mo. Dept. of Health* (1990), 497 U.S. 261, 278-279, 110 S.Ct. 2841, 2851-2852, 111 L.Ed.2d 224, 241-242. See, also, *State v. Williams* (2000), 88 Ohio St.3d 513, 523, 728 N.E.2d 342, 353-354 ("[R]ights outlined in Section 1, Article I [of the Ohio Constitution] will, at times, yield to government intrusion when necessitated by the public good"). In order for us to determine whether a court must find a mentally ill person to be a danger to himself/herself or others before it may issue an order permitting forced medication, we must first determine which, if any, state interests outweigh the individual's right to refuse medication.

II

{¶ 18} The first step in our analysis is to examine the individual's interest in avoiding forced medication through treatment with antipsychotic drugs. We will then determine under what circumstances, if any, that interest must yield to competing governmental interests.

{¶ 19} The liberty interests infringed upon when a person is medicated against his or her wishes are significant. "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229, 110 S.Ct. at 1041, 108 L.Ed.2d at 203. This type of intrusion clearly compromises one's liberty interests in personal security, bodily integrity, and autonomy.

{¶ 20} The intrusion is "particularly severe" when the medications administered by force are antipsychotic drugs because of the effect of the drugs on the human body. *Riggins v. Nevada* (1992), 504 U.S. 127, 134, 112 S.Ct. 1810, 1814, 118 L.Ed.2d 479, 488. Antipsychotic drugs alter the chemical balance in a patient's brain producing changes in his or her cognitive processes. *Id.* at 134, 112 S.Ct. at 1814, 118 L.Ed.2d at 488; *Harper*, 494 U.S. at 229, 110 S.Ct. at 1041, 108 L.Ed.2d at 203. See, also, Winick, The Right to Refuse Mental Health Treatment (1997) 61-65 ("Winick"). In fact, an alteration of a patient's cognitive process is the intended result of the antipsychotic drugs. The drugs are administered with the expectation that the resulting changes will "assist the patient in organizing his or her thought processes and regaining a rational state of mind." *Harper*, 494 U.S. at 214, 110 S.Ct. at 1032, 108 L.Ed.2d at 193.

{¶ 21} The interference with one's liberty interest is further magnified by the negative side effects that often accompany antipsychotic drugs, some of which can be severe and/or permanent. *Riggins*, 504 U.S. at 134, 112 S.Ct. at 1814, 118 L.Ed.2d at 488; *Harper*, 494 U.S. at 229, 110 S.Ct. at 1041, 108 L.Ed.2d at 203; Winick at 72-75. The most common side effects of the antipsychotic drugs are

Parkinsonian syndrome, akathisia, dystonia, and dyskinesia. *Harper*, 494 U.S. at 229-230, 110 S.Ct. at 1041, 108 L.Ed.2d at 203; *Mills v. Rogers* (1982), 457 U.S. 291, 293, 102 S.Ct. 2442, 2445, 73 L.Ed.2d 16, 19, fn. 1; *Rivers v. Katz* (1986), 67 N.Y.2d 485, 490, 504 N.Y.S.2d 74, 76, 495 N.E.2d 337, 339, fn. 1; Winick at 72-75; Gutheil & Appelbaum, "Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication (1983), 12 Hofstra L.Rev. 77, 107.

{¶ 22} "Parkinsonian syndrome * * * consists of muscular rigidity, fine resting tremors, a masklike face, salivation, motor retardation, a shuffling gait, and pill-rolling hand movements. Akathisia is a feeling of motor restlessness or of a compelling need to be in constant motion * * *. Dystonia involves bizarre muscular spasm, primarily of the muscles of the head and neck, often accompanied by facial grimacing, involuntary spasm of the tongue and mouth interfering with speech and swallowing, oculogyric crisis marked by eyes flipping to the top of the head in a painful upward gaze persisting for minutes or hours, convulsive movements of the arms and head, bizarre gaits, and difficulty walking. The dyskinesias present a broad range of bizarre tongue, face, and neck movements." Winick at 72-73.

{¶ 23} Virtually all of these reactions are reversible within hours or days of discontinuing the antipsychotic medication. *Id.* at 73. However, tardive dyskinesia, which consists of slow, rhythmical, repetitive, involuntary movements of the mouth, lips, and tongue, is permanent and there is no known effective treatment for managing its symptoms. *Id*. at 73-74; *Harper*, 494 U.S. at 230, 110 S.Ct. at 1041, 108 L.Ed.2d at 203; *Rogers*, 457 U.S. at 293, 102 S.Ct. at 2445, 73 L.Ed.2d at 19, fn. 1.

{¶ 24} Experts disagree as to the percentage of patients who will develop tardive dyskinesia after being treated with antipsychotic drugs. Winick at 74, fn. 69; *Harper*, 494 U.S. at 230, 110 S.Ct. at 1041, 108 L.Ed.2d at 203. In *Harper*, the United States Supreme Court found sufficient evidence to support the finding that

ten to twenty-five percent of patients treated with antipsychotic medication developed tardive dyskinesia and among that group, sixty percent had mild symptoms while ten percent demonstrated more severe symptoms. *Harper*, 494 U.S. at 230, 110 S.Ct. at 1041, 108 L.Ed.2d at 204.

{¶ 25} Another potential side effect of antipsychotic medication is neuroleptic malignant syndrome. This is a rare but potentially deadly syndrome that develops quickly and leads to death in twenty-five percent of those who develop it. *Id.*, 494 U.S. at 230, 110 S.Ct. at 1041, 108 L.Ed.2d at 203; Winick at 74.

{¶ 26} In light of the foregoing, it is clear why the United States Supreme Court recognized that a substantial liberty interest was at stake in these cases. Whether the potential benefits are worth the risks is a personal decision that, in the absence of a compelling state interest, should be free from government intrusion.

### III

{¶ 27} We now turn to the second step of our analysis to determine whether, in some circumstances, a person's liberty interest in refusing antipsychotic medication is outweighed by a competing government interest.

### A

{¶ 28} One state interest that is sufficiently compelling to override an individual's decision to refuse antipsychotic medication is the state's interest in preventing mentally ill persons from harming themselves or others. Many courts have held that hospital personnel and prison officials may administer antipsychotic drugs to mentally ill persons to prevent harm. See, *e.g.*, *Harper*, *supra*; *Riggins*, *supra; Rennie v. Klein* (C.A.3, 1983), 720 F.2d 266 (*en banc*); *Rogers v. Okin* (C.A.1, 1984), 738 F.2d 1; *Bee v. Greaves* (C.A.10, 1984), 744 F.2d 1387, certiorari denied (1985), 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334; *Large v. Superior Court* (1986), 148 Ariz. 229, 714 P.2d 399 (*en banc*); *Rivers*, *supra; Rogers v. Commr. of Mental Health* (1983), 390 Mass. 489, 458 N.E.2d 308. The state's

interest in protecting its citizens flows from the state's police power. The state's right to invoke its police power in these cases turns upon the determination that an emergency exists in which a failure to medicate a mentally ill person with antipsychotic drugs would result in a substantial likelihood of physical harm to that person or others. Because this power arises only when there is an imminent threat of harm, the decision whether to medicate the patient must be made promptly in order to respond before any injury occurs. For this reason, there is no time for a judicial hearing and medical personnel must make the determination whether the patient is an imminent danger to himself/herself or others.

{¶ 29} The requirement that medical personnel determine that there is an *imminent* danger of harm cannot be overemphasized. The police power may not be asserted broadly to justify keeping patients on antipsychotic drugs to keep them docile and thereby avoid potential violence. Moreover, this governmental interest justifies forced medication only as long as the emergency persists. Furthermore, the medication must be medically appropriate for the individual and it must be the least intrusive means of accomplishing the state's interest, *i.e.*, preventing harm.

{¶ 30} Accordingly, we hold that when an involuntarily committed mentally ill patient poses an imminent threat of harm to himself/herself or others, the state's interest in protecting its citizens outweighs the patient's interest in refusing antipsychotic medication. Authority for invoking the state's interest flows from the police power of the state. Whether an involuntarily committed mentally ill patient poses an imminent threat of harm to himself/herself or others warranting the administration of antipsychotic drugs against the patient's will is uniquely a medical, rather than a judicial, determination to be made by a qualified physician. A physician may order the forced medication of an involuntarily committed mentally ill patient with antipsychotic drugs when the physician determines that (1) the patient presents an imminent danger of harm to himself/herself or others, (2)

there are no less intrusive means of avoiding the threatened harm, and (3) the medication to be administered is medically appropriate for the patient.

**{¶ 31}** While this holding appears to be placing tremendous power and authority in the hands of individual physicians, we are nevertheless reminded that physicians are "dedicated to providing competent medical service with compassion and respect for human dignity." Principle I, American Medical Association Code of Medical Ethics (1994) XV. "I will follow that system of regimen which, according to my ability and judgment, I consider for the benefit of my patients, and abstain from whatever is deleterious and mischievous." The Oath of Hippocrates, 38 Harvard Classics (1910) 3. We are confident that properly trained, competent, and compassionate physicians will not abuse such power.

**{¶ 32}** In the case at bar, appellant's treating physician testified that appellant was not an imminent danger to himself or others. The hospital, therefore, was precluded from relying on the state's police power to override appellant's decision to refuse medication.

B

**{¶ 33}** A second state interest recognized by many courts to be sufficiently compelling to override a mentally ill patient's decision to refuse antipsychotic medication is the state's *parens patriae* power.[5] See, *e.g.*, *Rivers*, *supra; Rogers v. Okin* (C.A.1, 1984), 738 F.2d 1; *Davis v. Hubbard* (N.D.Ohio 1980), 506 F.Supp. 915; *People v. Medina* (Colo.1985), 705 P.2d 961 (*en banc*); *Rogers v. Commr. of Mental Health*, *supra; In re K.K.B.* (Okla.1980), 609 P.2d 747; *Steinkruger v. Miller* (2000), 2000 S.D. 83, 612 N.W.2d 591; *In re C.E.* (1994), 161 Ill.2d 200, 204 Ill.Dec. 121, 641 N.E.2d 345; *In re Guardianship of Linda* (1988), 401 Mass. 783, 519 N.E.2d 1296; *Jarvis v. Levine* (Minn.1988), 418 N.W.2d 139; *In re Mental*

---

5. *Parens patriae* means "parent of his or her country," and refers to "[t]he state regarded as a sovereign; the state in its capacity as provider of protection to those unable to care for themselves." Black's Law Dictionary (7 Ed.1999) 1137.

*Commitment of M.P.* (Ind.1987), 510 N.E.2d 645; *Opinion of the Justices* (1983), 123 N.H. 554, 465 A.2d 484. Today, we too adopt the view that the state's *parens patriae* power can override a mentally ill patient's decision to refuse antipsychotic medication.

**{¶ 34}** A state's *parens patriae* power allows it to care for citizens who are unable to take care of themselves. *Addington v. Texas* (1979), 441 U.S. 418, 426, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 331. Because this power turns on a person's inability to care for himself/herself, it is legitimately invoked in forced-medication cases only when the patient lacks the capacity to make an informed decision regarding his/her treatment. *Davis*, 506 F.Supp. at 935-936; *Rivers*, 67 N.Y.2d at 496, 504 N.Y.S.2d at 80, 495 N.E.2d at 343 ("The *sine qua non* for the state's use of its *parens patriae* power as justification for the forceful administration of mind-affecting drugs is a determination that the individual to whom the drugs are to be administered lacks the capacity to decide for himself whether he should take the drugs."). Thus, we hold that when an involuntarily committed mentally ill patient, who does not pose an imminent threat of harm to himself/herself or others, lacks the capacity to give or withhold informed consent regarding his/her treatment, the state's *parens patriae* power may justify treating the patient with antipsychotic medication against his/her wishes. *In re Milton*, *supra*, is therefore modified.

**{¶ 35}** We recognize that this holding is inconsistent with our statement in *Milton* that "the state may not act in a *parens patriae* relationship to a mental hospital patient unless the patient has been *adjudicated incompetent*." (Emphasis added.) *Id*. at 23, 29 OBR at 376, 505 N.E.2d at 257-258. We no longer adhere to that absolutist position.[6] "Traditionally, an adjudication of incompetency rendered an individual generally incompetent—he was placed under total legal disability and

---

6. While we no longer approve of the statement in *Milton* regarding when the *parens patriae* power may be invoked, we nevertheless recognize that the decision in *Milton* was proper and fully supported. *Milton* was decided in the context of a religious objection by a *competent* individual, and the *parens patriae* power was not at issue in that decision.

14

a guardian was appointed to make all decisions on his behalf. The law has moved strongly away from this notion of general incompetency in favor of an approach requiring adjudications of specific incompetency. Under the more modern view, the law determines an individual to be incompetent to perform only particular tasks or roles, such as: to decide on hospitalization; to manage property; to consent to treatment; or to stand trial. This adjudication of specific incompetency does not render the individual legally incompetent to perform other tasks or to play other roles." Winick, Competency to Consent to Treatment: The Distinction Between Assent and Objection (1991), 28 Hous.L.Rev. 15, 22-24. See, also, Appelbaum & Gutheil, Clinical Handbook of Psychiatry and the Law (2 Ed.1991) 225.

{¶ 36} We accept the concept of specific incompetency, at least in the context addressed herein. Therefore, a person need not be *adjudicated incompetent* before the state's *parens patriae* power is legitimately invoked in a forced medication case. It is sufficient that the court find by clear and convincing evidence that the patient lacks the capacity to give or withhold informed consent regarding treatment. We believe that requiring an adjudication of general incompetence in these cases would result in the unnecessary removal of additional civil rights particularly when a specific finding of lack of capacity regarding treatment is sufficient. Furthermore, it allows the patient to avoid the added stigma that often attaches to a person who has been adjudicated incompetent.

{¶ 37} Perhaps contrary to common belief, a court's determination that a person is mentally ill and subject to involuntary commitment in a hospital is not equivalent to a finding that the person is incompetent. *Milton*, 29 Ohio St.3d at 22, 29 OBR at 375, 505 N.E.2d at 257; *Rivers*, 67 N.Y.2d at 494-495, 504 N.Y.S.2d at 79, 495 N.E.2d at 341-342; Appelbaum & Gutheil, Clinical Handbook of Psychiatry and the Law, at 220 ("The mere presence of psychosis, dementia, mental retardation, or some other form of mental illness or disability is insufficient in itself to constitute incompetence."). In fact, a person's involuntary commitment to a

hospital due to a mental illness does not even raise a presumption that the patient is incompetent. *Milton*, 29 Ohio St.3d at 22-23, 29 OBR at 375, 505 N.E.2d at 257. Under Ohio law, these patients retain all civil rights not specifically denied in the Revised Code or removed by an adjudication of incompetence. *Id.* at 23, 29 OBR at 375, 505 N.E.2d at 257; R.C. 5122.301. The rights retained include, among others, the right to contract, hold a professional license, marry, obtain a divorce, make a will, and vote. R.C. 5122.301; see *Milton* at 23, 29 OBR at 375, 505 N.E.2d at 257.

**{¶ 38}** Based on the foregoing, it is clear that mental illness and incompetence are not one and the same. Therefore, the state may not rely on its *parens patriae* power to justify making treatment decisions for a mentally ill person simply because that person has been involuntarily committed. Before invoking this power, the state must first prove by clear and convincing evidence that the patient lacks the capacity to give or withhold informed consent regarding treatment. Whether an involuntarily committed mentally ill patient, who does not pose an imminent threat of harm to himself/herself or others, lacks the capacity to give or withhold informed consent regarding treatment is uniquely a judicial, rather than a medical, determination. If a court does not find that the patient lacks such capacity, then the state's *parens patriae* power is not applicable and the patient's wishes regarding treatment will be honored, no matter how foolish some may perceive that decision to be.[7] *Rogers v. Commr. of Mental Health*, 390 Mass. at 497-498, 458 N.E.2d at 314, quoting *Harnish v. Children's Hosp. Med. Ctr.* (1982), 387 Mass. 152, 154, 439 N.E.2d 240, 242 (" 'Every competent adult has a right "to forego treatment, or even cure, if it entails what for him are intolerable consequences or risks however unwise his sense of values may be in the eyes of the medical profession." ' ").

---

7. The exception is, of course, where the state's police power is implicated.

{¶ 39} Conversely, when a court finds by clear and convincing evidence that a patient lacks the capacity to give or withhold informed consent regarding treatment, then the state's interest in caring for its citizen overrides the patient's interest in refusing treatment. When, in addition, the court also finds by clear and convincing evidence that the benefits of the antipsychotic medication outweigh the side effects, and that there is no less intrusive treatment that will be as effective in treating the illness, then it may issue an order permitting forced medication of the patient. Accordingly, we hold that a court may issue an order permitting hospital employees to administer antipsychotic drugs against the wishes of an involuntarily committed mentally ill person if it finds, by clear and convincing evidence, that (1) the patient does not have the capacity to give or withhold informed consent regarding his/her treatment, (2) it is in the patient's best interest to take the medication, *i.e.*, the benefits of the medication outweigh the side effects, and (3) no less intrusive treatment will be as effective in treating the mental illness.

IV

{¶ 40} Because of the significant liberty interest affected when an individual is medicated against his/her will with antipsychotic medication, we do not come to this decision lightly. We have attempted to craft a decision that acknowledges a person's right to refuse antipsychotic medication, and yet recognizes that mental illness sometimes robs a person of the capacity to make informed treatment decisions. Only when a court finds that a person is incompetent to make informed treatment decisions do we permit the state to act in a paternalistic manner, making treatment decisions in the best interest of the patient.

{¶ 41} We also note that, in making our decision, we took into consideration not only the potential severe side effects of antipsychotic drugs, but also the well-documented therapeutic benefits of antipsychotic medication. " 'Psychotropic medication is widely accepted within the psychiatric community as an extraordinarily effective treatment for both acute and chronic psychoses,

particularly schizophrenia.' " *Harper*, 494 U.S. at 226, 110 S.Ct. at 1039, 108 L.Ed.2d at 201, fn. 9, quoting Brief for American Psychological Association et al. as *amici curiae*. See, also, Winick at 70. Prior to the use of antipsychotic medication in the treatment of schizophrenia and related psychoses, persons suffering from these illnesses were placed in hospitals with little chance of being released. Because these mental illnesses are frequently manifested by uncooperative behavior, psychotherapy is not an effective treatment. Hospitals were, therefore, providing nothing more than custodial care to these patients. Since physicians began treating mental illnesses with antipsychotic medication in the 1950s, the number of mentally ill persons requiring long-term hospitalization has been greatly reduced. Winick at 68-69; Gutheil & Appelbaum, 12 Hofstra L.Rev. at 99-101; *Riese v. St. Mary's Hosp. & Med. Ctr.* (1987), 209 Cal.App.3d 1303, 1310-1311, 271 Cal.Rptr. 199, 203.

{¶ 42} We believe that a failure to recognize the state's *parens patriae* power in these cases would result in the warehousing of those patients who, against their best interest, refuse medication when they do not have the capacity to comprehend their decision. We believe such a result is inhumane and, therefore, unacceptable.

{¶ 43} In the case at bar, the probate court found that appellant lacked the capacity to give or withhold informed consent regarding his treatment, thereby triggering the state's *parens patriae* power. The additional findings required by our holding, *i.e*., whether the medication is in the patient's best interest and whether a less intrusive treatment would be as effective, must be made before a decision regarding forced medication of appellant can be made. We do not, however, remand this case for those additional findings because, as indicated in appellant's

brief and at oral argument, appellant is voluntarily taking antipsychotic medication.[8]

V

{¶ 44} One last issue remains. We indicated that the Due Process Clause of the Fourteenth Amendment to the United States Constitution protects each person's liberty interest in refusing medication. Up to this point, we have addressed mainly *substantive* due process issues, *e.g.*, the factual circumstances that must exist before antipsychotic drugs may be administered to a patient against his/her wishes. Although appellant did not raise any *procedural* due process issues in the instant case, we believe it advisable that we discuss the procedural due process that must be afforded in a forced medication proceeding, *i.e.*, the procedures that must be followed in determining the pertinent facts.

{¶ 45} As indicated previously, when the state's police power is invoked, a trained physician determines the relevant facts. The physician is bound by his profession to follow the appropriate accepted medical guidelines when making his/her findings.

{¶ 46} We now turn to the procedures required when determining whether the forced medication of a mentally ill person pursuant to the state's *parens patriae* power outweighs an involuntarily committed mentally ill person's interest in refusing antipsychotic medication. We have stated that when a treating physician

---

8. We recognize that an argument can be made that the question concerning appellant now before us is moot because he is voluntarily taking antipsychotic medications. We find, however, that there is no evidence in the record that appellant has recovered from his mental illness or that he has been released from the Lewis Center. Should appellant refuse antipsychotic medication in the future, which is possible given his medical condition, it is reasonable to expect that he would again be subject to an action for forced medication. Thus, the issue is one that is capable of repetition, yet evading review, and as such it is not moot. *State ex rel. The Repository v. Unger* (1986), 28 Ohio St.3d 418, 420, 28 OBR 472, 474, 504 N.E.2d 37, 39. See, also, *Washington v. Harper* (1990), 494 U.S. 210, 218-219, 110 S.Ct. 1028, 1035, 108 L.Ed.2d 178, 196. In any event, this case involves a matter of public or great general interest and, therefore, the court is vested with the jurisdiction to hear the appeal, even if the case were moot. *In re Appeal of Suspension of Huffer from Circleville High School* (1989), 47 Ohio St.3d 12, 14, 546 N.E.2d 1308, 1310.

claims that the state's *parens patriae* power permits forced medication, such determination is a uniquely judicial function. Accordingly, if the patient is not represented by an attorney, then an attorney must be appointed to represent the patient; an independent "psychiatrist or a licensed clinical psychologist and a licensed physician"[9] must be appointed to examine the patient, to evaluate the recommended treatment, and to report such findings and conclusions to the court regarding the patient's capacity to give or withhold informed consent as well as the appropriateness of the proposed treatment; and the patient, his/her attorney, and treating physicians must receive notice of all hearings and the patient must be provided the opportunity to be present at all hearings and to present and cross-examine witnesses. Of course, the court may implement additional procedures to protect the patient's rights as the court sees fit, such as the appointment of a guardian *ad litem* to represent the interests of the patient.

**{¶ 47}** Additional procedures, such as periodic hearings to reevaluate the patient's capacity and the efficacy of the treatment, will be necessary in those cases where an order is issued permitting the forced administration of drugs. We realize that each forced medication case is unique and, therefore, we do not set specific guidelines other than to state that all court orders permitting the administration of antipsychotic drugs against a patient's wishes should be periodically reviewed, and continued forced medication should be substantiated by competent medical evidence. Appropriate motions to continue forced medication may be filed as the need arises. A motion to continue forced medication is subject to the same procedural safeguards as an original motion for forced medication.

**{¶ 48}** As stated above, appellant did not argue that his procedural due process rights were violated in the instant case. However, our review of the record indicates that the procedures followed by the probate court were sufficient.

---

9. The language in R.C. 5122.14 is used and now adopted in a different context.

Conclusion

**{¶ 49}** For the reasons set forth above, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

PFEIFER, J., concurs in part.

COOK, J., concurs in judgment.

———————————

**PFEIFER, J., concurring in part.**

**{¶ 50}** I concur with the court's holding and all of the syllabus paragraphs except paragraphs three and four. In my view, paragraphs three and four of the syllabus answer important legal questions that are not present in this particular case. I would save the resolution of those issues for a more appropriate case. I am troubled by the notion that involuntarily committed mentally ill patients will have their lives greatly altered by potentially dangerous drugs with little recourse in the legal system.

———————————