DECISION
{¶ 1} Respondent-appellant, T.B., appeals from a judgment of the Franklin County Court of Common Pleas, Probate Division, that overruled respondent's objections to the magistrate's July 5, 2006 decision, adopted the magistrate's decision, and ordered (1) respondent's continued hospitalization pursuant to R.C. 5122.01, and (2) forced medication of respondent. Because the probate Court's judgment is supported by clear and convincing evidence, we affirm.
 {¶ 2} On January 26, 2006, respondent was indicted on 16 counts of retaliation, extortion, and telephone harassment. Respondent was found incompetent to stand trial with no substantial probability he could be restored to competency within the time frame required by law. As a result, the trial court filed an affidavit in the Franklin County probate court pursuant to R.C. 2945.38(B)(2) for civil commitment, contending respondent is a mentally ill person subject to hospitalization by court order.
 {¶ 3} Based on the evidence presented during the hearing, the probate court overruled respondent's objections to the magistrate's decision. It found by clear and convincing evidence that respondent is a mentally ill person subject to court-ordered hospitalization pursuant to R.C. 5122.01(B)(2) and 5122.01(B)(4), and it ordered a commitment period not to exceed 90 days. Respondent appealed, and this court affirmed. In re: T.B.,
Franklin App. No. 06AP-477, 2006-Ohio-3452 ("In re: T.B. I").
 {¶ 4} Subsequent to this court's decision, a hearing was held before a magistrate of the probate court resulting in an a decision continuing respondent's commitment and ordering forced medication; the probate court adopted the magistrate's decision the same day. The next day respondent filed objections to the magistrate's decision. While the objections were pending, the Community Mental Health and Recovery Board Serving Licking and Knox Counties requested an interim order requiring forced medication of respondent. The probate court set the matter for hearing on July 18, 2006, and the next day granted an order for respondent's forced medication. On July 26, 2006, respondent requested a stay, but the probate court denied it for the reasons set forth in its July 19, 2006 order granting the interim order for forced medication.
 {¶ 5} Respondent appealed the probate court's order granting the interim order, and further requested a stay pending appeal. On July 27, 2006, this court granted the stay pending determination of appellate jurisdiction. After concluding it had appellate jurisdiction over the interim order, this court continued the stay and expedited the appeal.
 {¶ 6} On August 15, 2006, the probate court considered respondent's objections to the magistrate's decision requiring his continued commitment and forced medication. The court overruled the objections and issued a final order, thereby automatically terminating the interim order and entering final judgment. As to the court's final judgment, respondent assigns two errors:
FIRST ASSIGNMENT OF ERROR
THE TRIAL COURT'S DECISION TO CONTINUE THE COMMITMENT OF THE APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
SECOND ASSIGNMENT OF ERROR
THE TRIAL COURT'S DECISION TO FORCIBLY MEDICATE THE APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
I. Respondent's First Assignment of Error
 {¶ 7} Respondent's first assignment of error contends the order of continued commitment is against the manifest weight of the evidence. Judgments supported by some competent, credible evidence addressing all the essential elements of the case will not be reversed on appeal as against the manifest weight of the evidence. See C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279.
 {¶ 8} "R.C. Chapter 5122 sets forth specific procedures to be followed when a person is committed to a mental hospital, whether voluntarily or involuntarily. When commitment is against a person's will, it is particularly important that the statutory scheme be followed so that the patient's due-process rights receive adequate protection." In re: Miller (1992),63 Ohio St.3d 99, 101. "[T]he individual's right against involuntary confinement depriving him or her of liberty must be balanced against the state's interest in committing those who are mentally ill and who pose a continuing risk to society or to themselves."In re: T.B. I, at ¶ 5, citing In re: Miller, supra. While confining mentally ill persons adjudged to be a risk to themselves or society both protects society and provides treatment in the hope of alleviating the mental illness, the state nonetheless must meet a heavy burden to show that the individual in fact suffers from a mental illness and must be confined in order to treat the illness. In re: T.B. I, at ¶ 5, citing State v. Welch (1997), 125 Ohio App.3d 49, at 52.
 {¶ 9} "Under Ohio law there is a three-part test for an involuntary commitment. Each part of this test must be established by clear and convincing evidence. The first two parts of the test are found in R.C. 5122.01(A). First, there must be a substantial disorder of thought, mood, perception, orientation, or memory. Second, the substantial disorder of thought, mood, perception, orientation, or memory must grossly impair judgment, behavior, capacity to recognize reality, or the ability to meet the ordinary demands of life. The third part of the test requires that the mentally ill person be hospitalized for one of the reasons set forth in R.C. 5122.01(B)." (Citations omitted.) Inre: T.B. I, at ¶ 7-8. In respondent's case, the record supports by clear and convincing evidence all three parts of the test for his continued involuntary commitment.
 {¶ 10} James Michael Oaks, M.D., testified respondent suffers from a delusional disorder, mixed persecutory and erotomanic type. Dr. Oaks explained that for approximately the eighth time respondent was admitted to Twin Valley Behavioral Health Care Center on March 31, 2006 due to threatening communications toward a common pleas judge. Respondent believes the judge made a wrong decision in his case and has for at least 14 years repeatedly communicated with the judge by telephone and in writing, threatening gruesome violence and sexual acts. Among respondent's multiple hospital admissions was a four-year stay from 1995 to 1999. His most recent prior admission was October 2004. As Dr. Oaks testified, respondent for a time was stable with out-patient antipsychotic medication administered by Mormon Builders Guidance Center, but beginning January 6, 2006, he began to communicate with the judge again, presenting himself in an intimidating and threatening way and demanding $100,000 in restitution. One message stated that "if I don't get a check, you'll be seeing God in person." (Tr. 25.) Dr. Oaks' testimony meets the first prong of the three-part test in defining the substantial mental illness from which respondent suffers.
 {¶ 11} The second part of the test requires that the substantial disorder grossly impair his judgment, behavior, capacity to recognize reality, or the ability to meet the ordinary demands of life. In that respect, Dr. Oaks testified respondent has no insight whatsoever into his mental illness. While respondent acknowledges the letters and phone calls, he denies they are threatening in any way. Similarly, although he admitted he earlier threatened gruesome, violent and sexual behavior, he claimed an absolute right to communicate, denied any mental illness, and wants to be released.
 {¶ 12} As Dr. Oaks explained, respondent's judgment is grossly impaired to his own detriment and to the interference of the substantial rights of others. Although his current communications are not as violent as his prior communications, Dr. Oaks opined that they do not stand on their own but are simply a continuation of his previous communications. Dr. Oaks testified that there was no chance that the different manifestations, being violent in the prior communications and financial in the latter, reflect two different disorders; instead, they are different manifestations of the same disorder. Dr. Oaks' testimony supports a finding that respondent lacks insight into his mental illness and has a grossly distorted view of reality under the second prong of the three-part test.
 {¶ 13} The third part of the test requires clear and convincing evidence meeting R.C. 5122.01(B)(1), (2), (3), or (4). Those provisions define a mentally ill person subject to hospitalization as one who (1) "[r]epresents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm"; (2) "[r]epresents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness"; (3) "[r]epresents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community"; or (4) "[w]ould benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person." R.C. 5122.01(B)(1)-(4).
 {¶ 14} The Supreme Court of Ohio employs a totality of circumstances test to determine whether a person is subject to hospitalization under R.C. 5122.01(B). The factors the probate court is to consider include, but are not limited to: "(1) whether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to laws, rules, regulations, and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically-suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment." Inre: T.B. I, at ¶ 9, citing In re: Burton (1984),11 Ohio St.3d 147, at 149.
 {¶ 15} The noted testimony of Dr. Oaks addresses many of the factors the Supreme Court delineated in Burton. Dr. Oaks also testified that respondent's mental illness places the common pleas judge at issue in a reasonable fear of violence, and as a result respondent should continue to be in a locked psychiatric unit. Dr. Oaks explained that in the past respondent communicated his belief that the common pleas judge is a bad judge and made a bad decision, but also that she would be a good partner for dating or even marriage. According to Dr. Oaks, the violent threats and the sexual suggestions are all part of the same delusional disorder, regardless of from where on the spectrum he is communicating. His more recent request for restitution is from the same disorder, just manifesting itself in different kinds of bad behavior. Thus, the fact that the recent manifestation is financial rather than violent or sexual does not indicate either a different problem or the matter has abated. Rather, because the delusions dominate respondent's waking life and have become the centerpiece of his identity, the doctor could predict that without treatment respondent would continue to have his behavior governed by his delusional system and would present a risk of harm to others and interference of the rights of others as a product of his mental illness. Dr. Oaks opined that treatment in a locked psychiatric unit was the least restrictive environment for respondent; that without it, respondent's prognosis was poor. Specifically, Dr. Oaks opined that if respondent refuses treatment, the doctor does not see how respondent can ever be released from the psychiatric unit; with treatment, he can be returned to out-patient care within a matter of weeks.
 {¶ 16} Dr. Oaks' testimony presents clear and convincing evidence of the trial court's finding that respondent is a mentally ill person who, because of his illness, represents a substantial risk of physical harm to others under R.C.5122.01(B)(2). Dr. Oaks specifically testified to the nature of respondent's mental illness, its continuing nature, and the risk for harm to others. In response to a question on cross-examination, he elaborated by stating that respondent's behavior continues to be governed by his delusions with repeated jailing and hospitalizations. His graphic threats of violence to the common pleas judge and others present a risk of harm to others not only physically, but psychologically as well.
 {¶ 17} The evidence also supports a finding under R.C.5122.01(B)(4) in that without the hospital treatment, respondent creates a grave and imminent risk to the substantial rights of others under R.C. 5122.01(B)(4). Specifically, respondent's behavior toward the common pleas judge substantially interferes with her rights, as Dr. Oaks opined. Indeed, his behavior toward her has resulted in a 16-count indictment against him. Accordingly, respondent's first assignment of error is overruled.
II. Respondent's Second Assignment of Error
 {¶ 18} Respondent's second assignment of error contends the trial court's judgment regarding forced medication is against the manifest weight of the evidence.
 {¶ 19} The Ohio Supreme Court in Steele v. Hamilton Cty.Mental Health Bd. (2000), 90 Ohio St.3d 176, stated that "[a] physician may order the forced medication of an involuntarily committed mentally ill patient with antipsychotic drugs when the physician determines that (1) the patient presents an imminent danger of harm to himself/herself or others, (2) there are no less intrusive means of avoiding the threatened harm, and (3) the medication to be administered is medically appropriate for the patient." Id., at paragraph three of the syllabus.
 {¶ 20} In the hearing regarding forced medication, Asim Farooqui, M.D., a psychiatrist at the Twin Behavioral Health Care Center, testified respondent lacks the capacity to make an informed decision regarding his medical treatment. As he explained, respondent suffers from a long-held systemized delusion which incorporates the legal, as well as the mental health, system into a working collaboration against him. During the time prior to his hospitalization, his mental illness peaked and continues to remain so. According to Dr. Farooqui, respondent believes that he has no psychiatric illness and that the process with the mental health system is a continuation of his persecution that originated in the courts during past litigation. As a result, although he can process the information regarding the medication, "he's completely divorced from the reality that he himself suffers from mental illness and, as such, he does not feel he has the need for psychiatric medication." (Tr. 57.)
 {¶ 21} In addition, Dr. Farooqui testified that the benefit expected to be achieved from the administration of psychiatric medication most definitely outweighs the risks of side effects from the medication. While discussing the medication, Dr. Farooqui testified to the appropriateness of the list of medications, explaining that some were included not with the purpose to immediately administer them, but to use them as alternatives should the first choice medications prove ineffective or produce unexpected side effects.
 {¶ 22} Dr. Farooqui also testified no reasonable alternative treatment regimen exists that would be less intrusive than the one he proposed. With the administration of the medication, Dr. Farooqui expects respondent would be returned to a productive life, with the ability to pursue his job, to refrain from pursuing efforts at restitution or threatening the judge, and to live without being consumed at the thought that he has been wronged and needs to retaliate. Without medication, respondent has resumed the all-consuming intensity of his delusional system, causing him to contact the judge and likely pursue the goal of restitution. Dr. Farooqui stated the condition will not spontaneously remit. He further offered that the longer respondent is in the hospital without medicine, the more difficult his condition is to treat because the psychopathology of his mental illness tends to cause more neurodegeneration. In his opinion, it is very likely that the level of consumption with the vindictive stance respondent has taken will switch to violence.
 {¶ 23} Dr. Oaks testified in the forced medication hearing, confirming the testimony of Dr. Farooqui. Specifically, he testified respondent lacks the capacity to make an informed decision regarding his treatment regimen. Although respondent understands the information presented to him, because of his mental illness he does not believe it applies to him and does not recognize he is ill. Dr. Oaks, too, agreed that the benefits outweigh the risks, that the patient's best interests lie in taking the medication, and that no reasonable alternative regimen is available.
 {¶ 24} Between them, the doctors' testimony addresses the three points in Steele and supports the trial court's determination that a forced medication order is necessary. Respondent's second assignment of error is overruled.
 {¶ 25} Having overruled both of respondent's assignments or error, we affirm the judgment of the Franklin County Court of Common Pleas, Probate Division.
Judgment affirmed.
Bryant, J., Klatt, P.J., and French, J., concur.