[Cite as *In re Guardianship of Rose*, 2017-Ohio-694.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CHAMPAIGN COUNTY**

| | |
|---|---|
| IN THE MATTER OF THE GUARDIANSHIP OF TONYA ROSE | :<br>:<br>:   C.A. CASE NO.  2016-CA-10<br>:<br>:   T.C. NO. 2016GI1<br>:<br>:   (Civil Appeal from Common<br>:    Pleas Court, Probate Division)<br>:<br>:<br>: |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ____24th____ day of _____February_____, 2017.

. . . . . . . . . . .

S. TODD BRECOUNT, Atty. Reg. No. 0065276, 115 N. Main Street, Suite A, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellee

DAVID J. FIERST, Atty. Reg. No. 0043954, 2533 Far Hills Avenue, Dayton, Ohio 45419
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} Tonya Rose appeals from a judgment of the Champaign County Court of Common Pleas, Domestic Relations-Juvenile-Probate Division, which found Rose to be incompetent and ordered that a guardian of her person be appointed for her. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} For the past 20 years, Rose has resided in Champaign County at Vancrest of Urbana, an extended care facility. Rose has difficulty speaking and paraplegia secondary to a brain injury caused by a chiropractic neck injury. Dr. Joshua Richards, a licensed physician at Vancrest of Urbana and Rose's physician for 28 years, reported that Rose has a post-ischemic brain injury, delusional thought disorder (schizophrenia), and pseudobulbar affect. In January 2016, Rose was 54 years old.

{¶ 3} On January 19, 2016, Staci Cottrill filed an application, pursuant to R.C. 2111.03, for the appointment of a guardian for Rose (person only). The application was accompanied by a Statement of Expert Evaluation, completed by Dr. Richards. Dr. Richards wrote that Rose's "paranoia [and] delusional thought processes cause her to refuse to take her antipsychotic medication." Rose's parents were identified as her next of kin, and they both signed a waiver of notice and consent to the appointment of Cottrill or another suitable person as Rose's guardian. Cottrill has no familial relationship with Rose; she is associated with Volunteers for Adult Life Enhancements ("VALE").

{¶ 4} Pursuant to R.C. 2111.041, a court investigator completed an investigation and filed a report with the probate court. The report also concluded that a guardianship of Rose's person was necessary.

{¶ 5} Rose opposed the appointment of the guardian, and an attorney was appointed to represent her. In March 2016, Rose requested a second expert evaluation. The court ordered a second evaluation to be completed by Dr. Richard Darr,[1] and he filed

---

[1] Rose had originally requested that a different physician conduct the second evaluation. When that physician would not accept Rose's insurance for a second evaluation opinion, the parties requested guidance from the court, and the court ordered Dr. Darr to complete

a report with the court on April 20, 2016. Dr. Darr also concluded that a guardianship should be established.

{¶ 6} The trial court held a hearing on the guardianship application on April 25, 2016. Rose stipulated to the reports provided by the physicians, but she testified on her own behalf in opposition to the guardianship. At the conclusion of the hearing, the court found, based on Rose's testimony and the expert evaluations, that Rose was incompetent by reason of mental and physical impairments, that Rose was incapable of taking care of herself, and that a guardianship was necessary. The court appointed Cottrill as the guardian of Rose's person. The next day, the court filed a written judgment entry reflecting its oral ruling.

{¶ 7} Rose asked the trial court to stay the guardianship decision. That motion was denied. Rose appeals the trial court's appointment of a guardian.

## II. Appointment of Guardian for Rose

{¶ 8} Rose's sole assignment of error claims that the trial court "did not find by clear and convincing evidence that Tonya Rose was in need of a guardianship." Citing *Steele v. Hamilton Cty. Community Mental Health Bd.*, 90 Ohio St.3d 176, 736 N.E.2d 10 (2000), Rose asserts that "mere presence of psychosis, dementia, mental retardation, or some other form of mental illness or disability is insufficient in itself to constitute incompetence." *Id.* at 186-187, quoting Appelbaum & Gutheil, Clinical Handbook of Psychiatry and the Law, at 220. Rose contends that, after 20 years in a nursing home, there was no evidence as to "why a guardianship is now necessary."

{¶ 9} R.C. 2111.02(A) authorizes a probate court to appoint, "if necessary," a

the evaluation.

guardian of the person, the estate, or both, of an incompetent person residing in the county. An "incompetent" includes "[a]ny person who is so mentally impaired, as a result of a mental or physical illness or disability, as a result of intellectual disability, or as a result of chronic substance abuse, that the person is incapable of taking proper care of the person's self or property." R.C. 2111.01(D)(1).

{¶ 10} R.C. 2111.02 sets forth the procedures for the appointment of a guardian. R.C. 2111.02(C) requires the court to conduct a hearing on the matter of appointment, during which "the burden of proving incompetency shall be by clear and convincing evidence." R.C. 2111.02(C)(3). The Ohio Supreme Court has defined "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

{¶ 11} The evidence before the probate court consisted of the expert evaluations, to which the parties stipulated, and Rose's testimony. Dr. Richards indicated that Rose refuses to take her prescribed medication, "as she is paranoid and thinks staff is trying to control her." In the "Additional Comments" portion of his expert evaluation, Dr. Richards wrote that Rose

> Has pseudobulbar affect which causes her to cry frequently when discussing her living situation and interacting with others. Becomes agitated frequently, throws food in cafeteria, suspicious of other residents.

Thinks others are out to get her (residents and staff) when talking with one she describes seeing other people in the room who pass through the walls and windows. Describes being sexually assaulted, in the past has thought she was impregnated by staff. According to staff, she refuses to wear clothes at times, will not accept their assistance with hygiene and dressing. Is very suspicious that staff are trying to hide medication in her food. Refuses to believe that, at present, she is not on medication.

Dr. Richards's report recommended that a guardianship be established.

{¶ 12} Dr. Darr's expert report read similarly. He wrote that Rose's "paranoid behavior [was] affecting judgment and personal care." Dr. Darr noted Rose's "marked physical disability" and that her paranoid psychosis resulted in "marked agitated behavior resulting in marked difficulty in providing personal care and providing necessary emotional support -- long [history] of paranoid delusions – reported to be exacerbated by refusal to take psychotropic medications. Patient appears to [have] above average intelligence but paranoid [sic] prevents appropriate judgment."

{¶ 13} Rose testified on her own behalf, with the assistance of Katheryn Ryan, who was familiar with Rose and could help interpret her speech. For purposes of clarity, the court repeated Rose's direct testimony, saying:

For the record let me try to repeat that answer. They don't believe in that and Miss Rose pointed to the Bible. She also stated they don't believe in witches, demons or wizards and that they don't believe there's a lot of sorcery going on. In Jesus's name. Amen. And I would also note for the record that Miss Rose is nodding her head up and down in the affirmative

at what the Court just repeated."

On cross-examination, Rose stated that she did not want a guardian, and "I don't see where I need one." Rose stated that she did not know Cottrill well.

{¶ 14} The court asked Rose about her medication. Rose stated that the staff did not bring her medication; instead, "they give me shots without my permission." When asked if she would take medication if it were brought to her, Rose responded, "Probably not. * * * Unless the neurosurgeon says to." (The neurosurgeon had treated Rose's initial injuries in 1993 and is no longer her treating physician.) Rose stated that she did not want to take her medicine because "It's the law" and "free will." Rose's attorney later stated, "I believe that my client is basically calling out her personal autonomy and suggesting that the medical world has offered her no solution to her problems and that she places her stock in her simple faith in God."

{¶ 15} We agree with Rose that a guardian cannot be appointed simply because the putative ward has a physical or mental illness or disability. *See, e.g., Steele*, 90 Ohio St.3d at 187 ("[I]t is clear that mental illness and incompetence are not one and the same."); *In re Guardianship of Worth*, 2d Dist. Darke No. 1430, 1997 WL 335559, * 3 (June 20, 1997) ("We agree with Worth that a guardian cannot be appointed simply because the putative ward suffers from physical ailments."). As stated above, to be incompetent, Rose must be "so mentally impaired, as a result of a mental or physical illness or disability," that she is "incapable of taking proper care" of herself or her property. *See* R.C. 2111.01(D)(1).

{¶ 16} Upon review of the record, the trial court had clear and convincing evidence from which to find that Rose was incompetent. Dr. Richards diagnosed Rose with

delusional thought disorder (schizophrenia); Dr. Darr stated that Rose had paranoid psychosis. There was evidence that, due to her paranoia and delusions, Rose had stopped taking her psychotropic medication. Dr. Darr indicated that Rose's paranoid psychosis was affecting her judgment and personal care. Dr. Richards also indicated that Rose was frequently agitated, was paranoid and suspicious of staff, had delusions about being impregnated, had visual hallucinations about people traveling through walls, threw food, refused to wear clothes at times, and was unwilling to accept assistance from staff members with her hygiene and dressing. The trial court thus had clear and convincing evidence that, not only had Rose been diagnosed with a mental illness and physical disabilities, but that her mental illness, in particular, resulted in Rose's being so mentally impaired that she was incapable of taking proper care of herself.

{¶ 17} Rose's assignment of error is overruled.

### III. Conclusion

{¶ 18} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, P.J. and DONOVAN, J., concur.

Copies mailed to:

S. Todd Brecount
David J. Fierst
Hon. Lori L. Reisinger